FREDERICK B. HARDING, Admr., Appellee, *vs.* ST. LOUIS
NATIONAL STOCK YARDS, Appellant.

*Opinion filed December 22, 1909.*

1. MASTER AND SERVANT—*doctrine of respondeat superior can
not be extended beyond master's work.* The responsibility of the
master for the negligence of his servant cannot be extended be-
yond the master's work, and the master is not responsible if the
servant was engaged, at the time of his negligence, in working
for himself or for a third person.

2. SAME—*the particular facts must be looked to to determine
whether master is responsible.* In determining whether the ser-
vant whose negligence caused an injury was at the time engaged
in the work of his master or was doing work for a third person
under circumstances such as made him the special servant of such
third person, the particular facts of the case must be looked into.

3. SAME—*test for determining whether servant is the special
servant of a third person.* One who is the general servant of one
party may be loaned or hired by his master to another party for
some particular service, so as to become, as to such service, the
servant of the latter, the test in such case being whether in the
particular service the servant continues to be under the direction
and control of his master or of the other party.

4. SAME—*when the question of special servants is one of fact.*
Whether a switch crew furnished by a switching company to a
packing company under a contract to do the packing company's
switching were the special servants of the packing company with
respect to the negligence of such crew is a question of fact, where
the negligent act was in one of the details of the work which was
left to the switch crew and where the switch crew were employed,
paid and controlled by the switching company, although the yard-
master of the packing company gave the crew directions as to
what switching was to be done.

5. INSTRUCTIONS—*when party cannot complain of error in in-
structions.* A party cannot complain, on appeal, of an error in his
opponent's instructions if his own instructions contain same error.

6. EVIDENCE—*what admissible as tending to show recognition
of liability for a servant's acts.* In an action against a switching
company for a personal injury caused by the negligence of the
company's switch crew while they were switching cars for a pack-
ing company, correspondence between the switching company and
the packing company with reference to an act of another crew in
backing a car into the packing company's car-shop and breaking

the doors and showing that the switching company paid the damages is admissible, as tending to show that the switching company regarded its crews as its own servants and recognized its responsibility for their negligent acts.

APPEAL from the Appellate Court for the Fourth District;—heard in that court on appeal from the City Court of East St. Louis; the Hon. W. J. N. MOYERS, Judge, presiding.

This is an action on the case brought to the March term, 1908, of the city court of East St. Louis by A. J. Magill in his lifetime, against the appellant and Armour & Co., to recover damages for personal injuries received by him while in the employ of the latter in the yards of its packing plant at East St. Louis. At the close of the evidence plaintiff dismissed his suit as to Armour & Co., after which the jury returned a verdict in favor of plaintiff for $7500, and judgment was rendered for that amount. On appeal to the Appellate Court that judgment was affirmed, and this appeal has followed.

The original plaintiff died after the appeal had been taken to the Appellate Court, and Frederick B. Harding, his administrator, was substituted as appellee.

Armour & Co. is engaged in the meat packing industry, and for this purpose operates and maintains a packing house in East St. Louis, and has on its grounds, for the purpose of its work, railroad tracks, yards and switches, all of this property being enclosed within a high board fence. Appellant has for a number of years maintained stock yards at or adjoining said city and has also been engaged in a general switching business, delivering loaded cars to and receiving empty cars from the various railroads. In carrying on its switching business it has maintained switch yards, equipped with railroad tracks, a machine shop and round-house, and has employed a switching crew for each engine. Armour's plant is located in the vicinity of

appellant's switch yards, as are a number of other large packing houses, and the switching business of these plants, including Armour & Co.'s, is done by appellant. One main or lead track connects the tracks in Armour's plant with the railroad tracks outside. After entering the yards along the north of the company's enclosure this lead track has tracks branching off from it at regular intervals towards the south-east, among them being certain tracks numbered consecutively from 1 to 10, called "repair tracks." These numbered tracks do not all connect directly with the fence track, but are arranged in groups of two or more, each group connecting with the fence track by a short lead track. Tracks 3 and 4 formed one of these groups, and in order to place a car upon either of them it was necessary to throw a switch from the fence track on to the short lead track and also a second switch at the point where the short lead divided into two tracks, the second switch determining whether the incoming car should be placed upon track numbered 3 or 4. The switching was done for Armour & Co. by appellant under a contract, by which the engine and crew under the charge of a foreman were furnished by appellant, this foreman directing the details of the switching work. To do this work an engine with a switching crew was sent to the packing plant of Armour & Co. each day, with generally, although not always, the same crew. The evidence tends to show that other crews were sent there for night work when occasion required. Under this contract, when cars were to be removed from one place to another in Armour & Co.'s yard the appellant was paid one dollar per car for such moving. When a car was to be moved from said plant to Armour & Co.'s plant in St. Louis appellant was paid two dollars per car. When cars loaded with products of Armour & Co. were consigned to customers at a distance the through rate was paid to the carrying railroads, and those roads paid appellant a switching charge of two dollars per car

for delivering the cars to them from Armour's plant. This compensation required appellant to return the empty cars and place them on Armour's track. Certain directions were given to this crew before going to the Armour plant in the morning, on what is known as the "Stock Yards Bulletin" in the office of the appellant. The yard-master employed by Armour & Co. gave directions to the foreman of the switching crew to move the cars from one track to another within the yards and between the plant and other places near by. He also gave the switching crew foreman lists of cars that were loaded and ready for delivery to the carrying roads. The method of switching from one track to another and taking the cars in and out of the yards appears to have been left solely to the switching crew. About the middle of the afternoon of August 15, 1907, a switching crew were at work in Armour & Co.'s yards distributing empty cars that had been returned from the carrying railroads. Repair track No. 4 was full of cars, a space having been left at the end of every second car, so that the repairers and cleaners could get about the cars conveniently. In this condition of the track it was called "set." In order to protect workmen in repairing and cleaning, it was the understood custom that when a track was so set no more cars should be sent in on the track or the cars disturbed in any manner. On this afternoon, when track No. 4 was set, the foreman of the switching crew threw the switch between the short lead and tracks 3 and 4 so as to connect track 3 with the lead, and took all the crew, except a brakeman named Wysong, out of the yards to bring in more cars. On the return of the engine with such cars it started, under the direction of the foreman, over the short lead connecting with 3 and 4, intending to push or "kick" the cars onto track No. 3. The evidence shows that while the crew were away the switch had been thrown back from 3 to 4, and the cars, instead of going in on track 3, went in on track 4, striking the spaced cars

on the latter track violently and causing them to move. Magill was at work under one of these cars, and when it moved a wheel ran over his left leg, cutting it off about four inches below the knee. The proof shows that Magill was injured while in the exercise of due care for his own safety.

At the close of plaintiff's case, and at the close of all the evidence, appellant made a motion that the jury should be instructed to find in its favor. These instructions were refused.

DAN McGLYNN, for appellant.

R. V. GUSTIN, and D. J. SULLIVAN, for appellee.

Mr. JUSTICE CARTER delivered the opinion of the court:

Some controversy is found in the record as to who changed the switch. Wysong, who was left there, denies that he did it, but another witness testified that he saw Wysong throw the switch just before the accident. It is not contended that this court can inquire into this controverted question of fact.

The chief contention of appellant is, that the members of the switching crew were not its servants but were the servants of Armour & Co. at the time of the accident. It is admitted that the switching crew were employed and paid by appellant, and while the evidence shows that complaints of neglect of duty or inefficiency against the members of the crew, made by Armour & Co., would be considered by appellant, yet the conclusion from the evidence is that appellant alone had the right to discharge the members of this crew.

There has been much discussion as to the reason of the rule holding the master responsible for the negligence of his servants. The generally accepted reason is that given in the early case of *Farwell* v. *Boston and Worcester Rail-*

*road Corporation,* 4 Metc. 49, in which Chief Justice Shaw stated (p. 55): "This rule is obviously founded on the great principle of social duty that every man in the management of his own affairs, whether by himself or by his agents or servants, shall so conduct them as not to injure another, and if he does not, and another thereby sustains damage, he shall answer for it. If done by a servant in the course of his employment and acting within the scope of his authority, it is considered, in contemplation of law, so far the act of the master that the latter shall be answerable *civiliter.*" This responsibility cannot be extended beyond the master's work. The master is not answerable for the negligence of the servant if the latter is doing his own work or that of some third person.

The contention of appellant is, that while the switching crew were in its general employ they were in the special employ of Armour & Co. at the time of the accident,—that is, it is contended that under the rule laid down by the United States Circuit Court of Appeals in *Clough* v. *Grand Trunk Western Railway Co.* 155 Fed. Rep. 81, the switching crew were the special servants of Armour & Co., and that for the time being appellant had parted with its control and direction of these servants and was not responsible for their acts of negligence. No absolute or arbitrary rule can be laid down by which it can be plainly seen in every case whether a person is the servant of the general or special master, as these terms are used in the decisions. The special facts of each case must be looked to in order to reach the proper conclusion. In *Foster* v. *City of Chicago,* 197 Ill. 264, it is held that the difference between an independent contractor and a mere servant is not determined solely by the retention of a certain kind or degree of supervision by the employer, and not by the phraseology of a single sentence or paragraph, but from the contract as a whole. This court in *Hale* v. *Johnson,* 80 Ill. 185, held that one who contracts to do a certain piece of work, either

242—29

entirely in accord with his own ideas or in accordance with a plan previously given to him by the person for whom the work is being done, without being subject to the orders of the latter in respect to the details of the work, is clearly a contractor and not a servant, and a person injured by his negligence in the performance of the work cannot recover against the one who employed the contractor. To the same effect is *Jefferson* v. *Jameson & Morse Co.* 165 Ill. 138. In *Foster* v. *Wadsworth-Howland Co.* 168 Ill. 514, this court held that one who contracts with a business house to do all its hauling and delivery work at a specified sum per week, furnishing teams, wagons and drivers, over which he retains full control, is a contractor and not a servant, and the business house is not liable for the negligent driving of the wagons, though its name and address are painted thereon. In Shearman & Redfield on Negligence (4th ed. secs. 160-162,) the rule is laid down that he is the master who has the choice, control and direction of the servants; that the master remains liable to a stranger for the negligence of his servants unless he abandons their control. The control of the servants does not exist unless the hirer has the right to discharge them and hire others in their places. The doctrine of *respondeat superior* is applicable where the person sought to be charged has the right to control the action of the person committing the injury. In quoting the above doctrine with approval in *Pioneer Fireproof Construction Co.* v. *Hansen,* 176 Ill. 100, this court said (p. 108) : "It follows that the right to control the negligent servant is the test by which it is to be determined whether the relation of master and servant exists; and, inasmuch as the right to control involves the power to discharge, the relation of master and servant will not exist unless the power to discharge exists." To the same effect is 2 Thompson on Negligence, sec. 12, p. 892. It was held by this court in *Consolidated Fireworks Co.* v. *Koehl,* 190 Ill. 145, that one who is a

general servant of one party may be lent or hired by his master to another for some special service, so as to become, as to such service, the servant of the other, the test in such case being whether in the particular service the servant continues to be under the direction and control of his master or of the other party. See, also, *Grace & Hyde Co.* v. *Probst,* 208 Ill. 147, and *Coughlan* v. *Cambridge,* 166 Mass. 268, where the same rule is laid down.

The doctrine of *respondeat superior* will apply only where the relation of master and servant is shown to exist between the wrongdoer and the person sought to be held liable for the injury. The master is he in whose business the servant is engaged at the time and who has the right to control and direct the servant's conduct. "Servants who are employed and paid by one person may nevertheless be *ad hoc* the servants of another in a particular transaction." (*Higgins* v. *Western Union Telegraph Co.* 156 N. Y. 75.) In many cases it has been held that a person may be in the general employment of one but lent to another in such a way as to become the servant for the occasion or for a time of the person to whom lent. These cases have generally depended upon the nature of the contract or the arrangement existing between the master and the third person. (*Driscoll* v. *Towle,* 181 Mass. 416.) In this last case the defendant was engaged in the general teaming business, and the only question was whether the driver of the wagon which knocked down the plaintiff was defendant's servant. The driver's contract of employment was with the defendant, who paid him his wages, but for some time he had been carrying property for an electric lighting company under an arrangement made with that company by the defendant. Every morning the driver reported to the company with his wagon, and after carrying out its orders all day returned at night to the defendant's stables. Sometimes he gave help, outside of driving his wagon and loading and unloading it, in pulling up arms on electric

light poles, or in pulling machinery, and the like. When the accident happened he was on his way to get some material, in pursuance of an order from the foreman of the electric light company. In that case the court said (p. 418): "The contract between the defendant and the electric light company was not stated in terms, but it fairly could have been found to have been an ordinary contract by the defendant to do his regular business by his servants in the common way. In all probability it was nothing more. Of course, in such cases the party who employs the contractor indicates the work to be done, and in that sense controls the servant as he would control the contractor if he were present. But the person who receives such orders is not subject to the general orders of the party who gives them. He does his own business in his own way, and the orders which he receives simply point out to him the work which he or his master has undertaken to do. There is not that degree of intimacy and generality in the subjection of one to the other which is necessary in order to identify the two and make the employer liable under the fiction that the act of the employed is his act. * * * In cases like the present there is a general consensus of authority that although a driver may be ordered by those who have dealt with his master to go to this place or that, to take this or that burden, to hurry or to take his time, nevertheless, in respect to the manner of his driving and the control of his horse, he remains subject to no orders but those of the man who pays him. Therefore he can make no one else liable if he negligently runs a person down in the street." In *Standard Oil Co.* v. *Anderson,* 212 U. S. 215, the court, in discussing this question, said (p. 225): "In many of the cases the power of substitution or discharge, the payment of wages, and other circumstances bearing upon the relation, are dwelt upon. They, however, are not the ultimate facts, but only those more or less useful in determining whose is the work and whose is the power of control."

In the light of these authorities we do not think, on the facts shown on this record, that this court can hold, as a matter of law, as contended for by counsel for appellant, that the switching crew were at the time of the accident such special servants of Armour & Co. that the said company only could be held liable for the negligence which caused the injury to appellee's intestate. The mere fact that the foreman of Armour & Co. gave a list of the cars, or stated to the foreman of the switching crew which cars should be transferred from one track to the other or taken from the yards to railroads outside, or what cars should be brought in from outside railroads to the yards, does not, as a matter of law, make the switching crew the servants of Armour & Co. On the evidence in this record it is uncontroverted that the details of this work of moving the cars or switches was carried on entirely by the switching crew. This accident was caused by the misplacing of a switch, which was entirely within the scope of the work of the switching crew and not under the direction of the foreman of Armour & Co. The evidence was such that the court cannot say, as a matter of law, that the switching crew were loaned to Armour & Co. so that they became subject to said company's control in doing the particular work which caused the accident. Viewing this evidence in the light most favorable to the appellant's contention, this was a question of fact to be submitted to the jury under proper instructions.

The instructions that were given to the jury by the trial court submitted the appellant's theory that its general servants (the switching crew) were the special servants, at the time of the accident, of Armour & Co. The appellant contends that the instructions of the appellee were misleading and erroneous on this point; that some of the instructions used the phrase, "under the control" of appellant, when they should have said "under the special control" of appellant, the argument being, that in view of the

facts in this case the jury would be misled by the use of the word "control" without any qualifying adjective, such as "special" or "exclusive." We do not think the jury were misled by the instructions, as contended. If, however, there be any basis for such a criticism of appellee's instructions, it is a sufficient answer to say that the word "control" was used in certain of appellant's given instructions without any qualifying adjective. Appellant cannot complain of an error in instructions for appellee if it has made the same error in its own instructions. *Peirce* v. *Walters,* 164 Ill. 560.

The further contention is made that some of the instructions given for appellee singled out and gave undue prominence to the testimony of some of the witnesses and that others assumed certain facts to be true. While there may be foundation for certain of these complaints, we do not think the mistakes were of such a nature as to warrant a reversal of the case. The instructions, taken as a series, fully and fairly instructed the jury, on behalf of appellant, as to all questions presented, and when so taken as a series we do not think the jury could have been misled by the alleged defects urged on behalf of appellant.

It is also objected that certain letters written by Armour & Co. to appellant, and by appellant in reply, were improperly admitted. These letters had to do with the fact that in delivering certain cars by appellant in the yard of Armour & Co. an engine had run into two cars on the repair track of Armour & Co., breaking the doors of the car shop, and it appears that the damage was paid for by appellant. The objection made to these letters is that the injuries occurred in the night time, and that the engine was not in the control of the regular day crew but of a special crew of appellant, with which crew Armour & Co. had nothing to do. There is nothing on the face of the letters or in the evidence in the record to indicate that the damages were caused in the night time. Furthermore,

we think the evidence was proper as tending to show that appellant considered the switching crew it sent into Armour & Co.'s yards its own servants and recognized its liability to pay Armour & Co. for injuries done by such crew.

We find no reversible error in the record. The judgment of the Appellate Court will be affirmed.

*Judgment affirmed.*