THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* JOHN RISCHO, Plaintiff in Error.

*Opinion filed April 23, 1914.*

1. CRIMINAL LAW—*an admission must be shown to have been made understandingly.* Before an admission can be used as evidence against the accused it must be shown to have been made understandingly, particularly where the accused is a foreigner who does not speak or understand English perfectly.

2. SAME—*when the accused should have the benefit of another trial.* If the testimony of the only witness attempting to identify the accused as the man seen running away from the scene of the shooting is inconclusive and there is evidence of an alibi by witnesses who give their residence and occupation, and there is no other evidence clearly connecting the accused with the crime, the accused should have the benefit of another trial.

3. SAME—*circumstantial evidence must be of a conclusive nature.* Circumstantial evidence, to warrant a conviction, must be of a conclusive nature and tendency, leading, on the whole, to a satisfactory conclusion, and producing a reasonable and moral certainty that the accused, and no one else, committed the crime.

4. SAME—*when Supreme Court will reverse judgment of conviction.* The Supreme Court will reverse a judgment of conviction for murder based upon purely circumstantial evidence where the evidence for the People does little more than raise a suspicion of the guilt of the accused.

5. SAME—*rule as to verbal admissions of accused.* Verbal admissions of the accused, if deliberately and understandingly made and fully proven, are satisfactory evidence, otherwise they are to be received with great caution.

6. SAME—*when statement of instruction with reference to attempt to escape is improper.* An instruction which authorizes the jury, in determining the guilt of the accused, to take certain things into consideration, including any flight or attempt to escape, is improper as not based on the evidence, where there is no evidence of any flight or escape other than the fact that the man who did the shooting ran away from the scene of the crime.

7. SAME—*statement that the jury should be convinced that they have an abiding conviction of the guilt of the accused is improper.* In a criminal case the jury should be convinced, from the evidence, of the guilt of the accused beyond a reasonable doubt, and it is improper for an instruction to state that the jury should be convinced that they have an abiding conviction of the guilt of the accused.

WRIT OF ERROR to the Circuit Court of Williamson county; the Hon. W. W. CLEMENS, Judge, presiding.

J. E. CARR, and SAWYER & OTEY, for plaintiff in error.

P. J. LUCEY, Attorney General, D. T. HARTWELL, State's Attorney, and A. B. GARRETT, for the People.

Mr. JUSTICE CRAIG delivered the opinion of the court:

John Rischo, the plaintiff in error, was indicted at the September term, 1913, of the Williamson county circuit court for the murder of Tony Povilionis. He was tried at the same term of court, found guilty of murder, and his punishment fixed by the jury at fourteen years in the penitentiary. Sentence was passed upon him by the court in accordance with the verdict. To secure a review of the matters contained therein plaintiff in error brings the record here and asks that the judgment pronounced against him by the court below be reversed, for the reasons that the evidence is not sufficient to support the verdict and the court improperly instructed the jury on behalf of the People and refused certain instructions offered by defendant.

Plaintiff in error, a miner by occupation, is a native of Austria and has been in the United States some seven or eight years. He had worked at a mine in Williamson

county about a year and then moved to Johnston City, where he lived about three months and then moved out to the New Virginia mine, about two miles from Johnston City, where he was living when arrested and charged with murder. While living at Johnston City he had a room in what was known as the Barlow building, living there by himself and doing his own cooking. Other men also lived in this building, among them the deceased, Tony Povilionis. The deceased was a Lithuanian. It does not appear from the evidence that plaintiff in error and deceased were intimate with each other, as they were of different nationalities and spoke different languages, nor does the evidence show that there was anything to cause any ill-feeling or enmity between plaintiff in error and deceased. On the night of July 30, 1913, Povilionis was shot twice by some person and a few days later died of the wounds. Jack Overby, the night policeman of Johnston City, was at the depot when he heard the shots, about 1:30 o'clock in the morning. He saw two men running down the street, who informed him a man was shot and that they were running for a doctor. Overby called Dr. Gore, and then went with the two men who had given him the information to the Barlow building. Povilionis was lying on a quilt spread on a platform or porch, which was about five feet above the ground, on the north side of the building. There were steps leading from this platform to the ground and also a stairway leading up from this platform into the building. Povilionis stated to the officer, and also to the doctor, that he was sleeping on the platform when he was awakened by someone feeling in his pocket. He grappled with the intruder and caught him by the hair; that he did not recognize his assailant, but he was a large man. The man shot him twice,—once in the abdomen and once in the groin. The bullets were from a thirty-eight calibre weapon. Povilionis' hat and shoes were off. The officer found a hat and pair of shoes on the top step of the porch leading up

from the ground. Povilionis stated they were not his hat and shoes. The officer took the hat found on the steps near the wounded man to the city hall and left the shoes at the building. Povilionis was carried up-stairs to his room by the doctor and others, and the doctor informed him that his wounds were mortal. He was taken to the hospital at Mount Vernon and died two days later.

The Barlow building, at the north end of which the shooting occurred, is situated at the north-east corner of a street intersection and faces to the south. R. G. Fleming and his wife lived in a house on the west side of the street that runs north and south past the Barlow building and about half way between the corner and the next street north. They were aroused from their sleep by the shots and came out on a balcony and saw a man run north along the street in front of their house, bareheaded and apparently without any shoes on his feet, as he made no noise. Fleming was not able to identify the defendant as the man he saw running past the house. Mrs. Fleming was not able to see well without glasses and did not have any on, and made no attempt to identify the defendant as the man she saw running. Fleming's evidence on this point was as follows:

Q. "Tell the jury what your best judgment is whether or not the man you saw pass your house was John Rischo. (Objected to as leading; sustained.)

Q. "In your best judgment, who was it?

A. "My judgment was—well, I don't know who it was that passed.

Q. "Well, what is your best judgment now about who it was you saw pass?

A. "My judgment is I saw no one that resembled that man more than that one.

Q. "Then what is your best judgment as to who it was?

A. "That is all the judgment I have. I have seen nobody else that resembled the man any more than him.

Q. "What is your best judgment as to whether or not it was John Rischo? (Objected to as being repetition.)

The court: "He may state who it was, in his judgment.

Q. "What is your best judgment as to whether that man was or was not John Rischo, this defendant here?

A. "Whether that man was this one or not, in my best judgment?

Q. "Yes, sir.

A. "Well, my best judgment is that it is him."

On cross-examination Fleming testified as follows:

Q. "Are you willing to tell the jury that that is the man?

A. "That is my judgment.

Q. "I am not asking you that; will you say that is the man?

A. "I couldn't say, only that is my judgment from what I saw. That judgment was formed from the glimpse I had of him as he ran by my house. He was running pretty fast. I could see him good after he passed from under the trees. The south light is away off. I get my light from the north light. I never said I recognized the man as John Rischo. When he was arrested I went down to the jail and he was pointed out to me. I recognized him as resembling the one I saw. If he had not been pointed out to me I probably would not have recognized him as the man I saw running past my house."

About four days after the shooting the plaintiff in error came into town wearing a hat similar in shape to the one found near the deceased and was taken in charge by George Boyer, the chief of police, and taken to the Barlow building and afterwards to the calaboose and questioned. The officer got the hat and shoes and insisted to the defendant that they were his hat and shoes. Defendant said they were not. Boyer tried the hat on the defendant. It seemed to fit, although it was size No. 7⅛ and defendant wore a No. 7. The officer informed him that he was suspected of having killed Povilionis. Defendant said he did

not kill him, and when questioned as to his whereabouts, stated that he was not in town that night. The officer states that later defendant admitted he was in town. He testified on the trial that the defendant, when shown the pair of shoes, said they were about size 8, "That is the size I wear." The officer did not know their size. The officer also stated that he then told defendant that a man saw him running away from the place of the shooting that night, and defendant stated he did not see anybody. The defendant denied this on the trial. His version of the conversation was that Boyer informed him that a man had seen him running away from the scene of the crime, and he asked the officer to go and get the man. While the defendant could speak and understand the English language it appears that he did so imperfectly, and what he actually said would be very apt to have a different meaning from what he attempted to convey. He testified as a witness on his own behalf that he informed the officer fully as to his movements, stating that he was in Johnston City on the 29th and again on the 31st day of July but that he was not there on the 30th, and fixes the dates when he was in town by the pay-day at the mine. He received his check on the 30th but did not get through his work in time to come to town, and it was threatening rain. He did come to town and cash his check on the 31st at the grocery store and paid bills that he owed at the grocery store and at a meat market, and this is corroborated by the proprietor of the grocery store, the butcher with whom he did his trading and by his acquaintances at the mine. At the time of his arrest, a few days after the crime, he came to town with a suit-case and was on his way to a laundry with his washing.

It will appear from the foregoing statement that the only question involved in the evidence was the identity of the defendant as the murderer. No one saw the shooting and no one identified the defendant as being in the vicinity at the time the hat and shoes were found near the place

of the murder. The police officers testified that the deceased always wore a dark, stiff hat or a cap, but one witness testified that he saw the deceased in the afternoon of the day he was killed wearing a hat very similar to the hat found with the shoes on the porch, only it was turned up instead of being turned down in the manner the defendant usually wore his hat. There was no corroborative evidence of the ante-mortem statement of the deceased that the hat and shoes were not his. The hat was not identified as the hat of the defendant and the shoes were not identified as belonging to him. At the time of the trial the defendant was wearing the hat he wore when arrested, which was similar in shape and color to the hat which was found at the scene of the murder and which was identified by William Hilf, a merchant, as one that he had sold the defendant in the month of May preceding. Hilf also identified the shoes that the defendant wore at the time of the trial as a pair that he had sold him at the same time. From the evidence of George Popp and Mrs. Popp, with whom defendant had boarded, it appears that the defendant had two hats,—one of which he wore at the time of the trial, and the other was a black hat, which he had when he came to Williamson county and which was still in his room. If the evidence had shown beyond question that the hat and shoes found at the scene of the crime did not belong to the deceased, and such fact could have been ascertained by an examination of the effects of the deceased, then the evidence of Mr. and Mrs. Fleming of a man running past the house bareheaded and apparently without shoes, and coming from the scene of the crime immediately thereafter, would be evidence that the hat and shoes belonged to the person who committed the crime. If, then, the ownership of the hat and shoes had been traced to the defendant, that fact, unexplained, would be strong proof of his presence at the scene of the crime and his consequent guilt. Such proof, however, is entirely lacking. It does not even ap-

pear. from the evidence that the shoes fitted the defendant, and the hat was not the same size he wore. Defendant's hats and shoes, as we have already stated, were accounted for by the merchant who sold them and by Mr. and Mrs. Popp, with whom he had boarded and who were familiar with his clothing and belongings. At the time of the trial the defendant was living in the second house from them at the mine where he worked.

The defendant gave a reasonable and apparently truthful account of his actions and whereabouts on the day of the crime and before and afterwards. It appears from the evidence that on the day of the crime he worked at the mine, got through his work about four o'clock in the afternoon, received his semi-monthly check, came home and washed up, and talked with George Popp about going to town to cash their pay checks, but concluded not to go because it was late and a rainstorm was threatening; that he spent the evening talking to Popp and others at Popp's house, and about 10 o'clock or 10:30 went to his own house, a few doors away, and retired. It is true that he did not account for his whereabouts at the exact time of the homicide, but as he roomed by himself he may have been unable to do so by other witnesses. The day after the shooting he worked as usual at the mine, and after his day's work was over came to town and cashed his check at the grocery store of J. W. Carpenter, paid a bill that he owed, went to the butcher and paid another bill, stopped at a pool room for awhile, and then went home. We do not think that there is anything in his statements to the officers at the time of the arrest but what is explained by his evidence in his own behalf. If he said, as the chief of police testified, when informed that a man had seen him running away, "I didn't see anyone," such statement could have been construed as an admission against him. The defendant claims, however, that he only used that expression in answer to a question by the officer as to whom he

saw and whom he met on his way home on the 29th or 31st of July, when he admits he was in town, and any statement or admission, before it could be used in evidence against him, should be shown to have been made understandingly, which was not the case, as he was a foreigner and could not speak or understand English perfectly, and statements made by such a person are not apt to convey their true meaning and are apt to be misunderstood.

We do not think that the evidence is sufficient to identify the defendant as the man seen running away from the place of the crime. In fact, there is no evidence at all except that of Fleming to connect the defendant with the crime, and he does not identify the defendant as the man he saw running from the scene of the crime. All he had was a passing glimpse, from a distance, of a man running along a street imperfectly lighted. He could not swear the defendant was that man. Where witnesses may be mistaken in identifying the accused and an alibi is proven by other witnesses who give their residence and occupation, so that the truth or falsity of their testimony may be inquired into on another trial, the court will give the accused the benefit of a second trial. *Lincoln* v. *People,* 20 Ill. 365.

Circumstantial evidence, to warrant a conviction of crime, must be of a conclusive nature and tendency, leading, on the whole, to a satisfactory conclusion, and producing a reasonable and moral certainty that the accused, and no one else, committed the crime. (*Dunn* v. *People,* 158 Ill. 586; *Marzen* v. *People,* 173 id. 43.) The guilt of the accused must be so thoroughly established as to exclude every other reasonable hypothesis. (*Purdy* v. *People,* 140 Ill. 46.) Although the Supreme Court is committed to the doctrine that the jury are the judges of the facts and the weight of the evidence in all criminal cases, yet if, upon a careful review of the evidence, it appears the conviction is based upon unsatisfactory evidence, or if, upon a consideration of the evidence, there remains such grave and seri-

ous doubt of the guilt of the accused as leads to the conclusion that the verdict of the jury is the result of prejudice or passion and not of that calm and deliberate consideration of the evidence which the law requires, the verdict will be set aside. (*Dahlberg* v. *People,* 225 Ill. 485.) This court will not hesitate to reverse a judgment of conviction for murder based on purely circumstantial evidence, where the evidence for the People does little more than raise a suspicion of the guilt of the accused. (*People* v. *Campagna,* 240 Ill. 378; *Lincoln* v. *People, supra; Marzen* v. *People, supra; Waters* v. *People,* 172 Ill. 367; *Keller* v. *People,* 204 id. 604.) Verbal admissions of the accused, if deliberately made and fully proven, are satisfactory evidence, otherwise they are to be received with great caution. *Lipsey* v. *People,* 227 Ill. 364; *Marzen* v. *People, supra,* and cases cited.

People's instruction No. 2, complained of, informed the jury that they have the right to take into consideration any declaration which the defendant has made; if shown by the evidence beyond a reasonable doubt; any contradictory statements made by him, if shown by the evidence beyond a reasonable doubt; any flight or attempt to escape, if shown by the evidence beyond a reasonable doubt. A similar instruction was condemned in *Marzen* v. *People, supra,* because the instruction did not contain the qualification that such statements of the defendant should be deliberately made and precisely identified. The latter part of the instruction, as to the flight or attempt to escape, is not based on the evidence, as there was no flight or attempt to escape by the defendant shown by the evidence, as those terms are commonly used and understood.

Instructions 4 and 5, while correct as abstract principles of law, should have been based on the evidence. They are misleading and faulty to some extent, as assuming the facts necessary to constitute the crime of murder. Instructions to a jury should be based on the evidence in the case on trial.

Had there been any evidence in this case that the accused robbed, or attempted to rob, the deceased, it would have been proper to instruct the jury that if they believed from the evidence, beyond a reasonable doubt, that the defendant robbed, or attempted to rob, the deceased, and if they. further believed from the evidence, beyond a reasonable doubt, that while engaged in said robbery the defendant shot and killed the deceased in manner and form as charged in the indictment, then such killing would, in law, be murder and they should find the defendant guilty of murder.

The People's tenth instruction is unnecessarily long and argumentative and was apt to mislead the jury. The instruction reads, in part, as follows: "If from all the facts and circumstances in this case the jury are convinced, as men, of the guilt of the defendant in manner and form as charged in the indictment, and that you have an abiding conviction that the defendant is guilty of murder in manner and form as charged in the indictment, then it is the duty of the jury to convict the defendant." The instruction tells the jury that if, from the facts and circumstances of the case, the jury are convinced that they have an abiding conviction that the defendant is guilty, etc. The jury should be convinced, from the evidence, of the guilt of the accused before they find a verdict of guilty,—not convinced that they had an abiding conviction of his guilt, as directed by the instruction.

Instruction No. 1 of defendant's refused instructions was not strictly accurate and could have been in better form, but we think it should have been given, as the only question in the case was the identity of the defendant, and the jury should have been instructed on that point. The other refused instructions were embodied in those given.

We do not think the giving of the instructions complained of or the refusal of defendant's instruction No. 1 would be sufficient error, alone, to justify a reversal of the case if the evidence sufficiently showed the guilt of plain-

tiff in error. With the evidence as it is in this record, the instructions should have been entirely free from error.

For the reasons given, the judgment of the circuit court of Williamson county will be reversed and the cause remanded to that court for a new trial.

*Reversed and remanded.*