(No. 11583.—Judgment affirmed.)

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* BERT SAPP, Plaintiff in Error.

*Opinion filed December 19, 1917—Rehearing denied Feb. 6, 1918.*

1. CRIMINAL LAW—*when instruction will not be regarded as assuming facts.* An instruction in a criminal case which sets out certain facts which, if proved, would warrant the jury in finding the defendant guilty, will not be regarded as assuming such facts because it fails to repeat before each fact stated the words, "if you believe from the evidence, beyond all reasonable doubt," which were used in the opening part of the instruction.

2. SAME—*direct proof need not be made that weapons causing death were unknown to grand jurors.* Where an indictment for murder alleges that the defendant murdered the deceased with an instrument or weapon unknown to the grand jurors, and the evidence shows that bruises were found on the head of the body sufficient to cause death, it is not necessary, in order to sustain a conviction, that any witness testify that such instrument or weapon was unknown to the grand jurors or that there be proof that an instrument or weapon was used.

3. SAME—*corpus delicti may be proved by circumstantial evidence.* Circumstantial evidence may be resorted to for the purpose of proving the *corpus delicti* in the same way and to the same extent that it may be used to connect the accused with the commission of the offense.

4. SAME—*when defendant will not be heard to complain of an instruction.* The defendant in a criminal case will not be heard to complain of an instruction for the People which uses the words "successfully impeached" without explaining their meaning, where an instruction given at his own request uses the same words.

5. SAME—*an accessory after the fact is not an accomplice.* Under the Illinois statute which makes a distinction between the punishment of an accessory before the fact and an accessory after the fact, an accessory after the fact is not regarded as an accomplice within the meaning of that term as used in an instruction concerning the weight to be given the testimony of an accomplice, and such an instruction is not applicable to the testimony of an accessory after the fact. (*Hoyt v. People,* 140 Ill. 588, distinguished.)

WRIT OF ERROR to the Circuit Court of Mercer county; the Hon. WILLIAM T. CHURCH, Judge, presiding.

L. H. HANNA, WILLIAM H. HARTZELL, BERT M. CAVA-
NAGH, and EDWARD S. MARTIN, for plaintiff in error.

EDWARD J. BRUNDAGE, Attorney General, OSCAR E.
CARLSTROM, State's Attorney, SUMNER S. ANDERSON, and
DAVID A. HEBEL, for the People.

Mr. CHIEF JUSTICE CARTER delivered the opinion of the
court:

At the September term, 1916, of the circuit court of
Mercer county the grand jury returned an indictment against
plaintiff in error, Bert Sapp, for the murder of Emma Lar-
kins.   At the April term, 1917, of that court plaintiff in
error was tried by a jury and found guilty of murder in
manner and form as charged in the indictment and his pun-
ishment fixed at imprisonment in the penitentiary for a term
of twenty-two years.   After motions for new trial and in
arrest of judgment were overruled judgment was entered on
the verdict.   This writ of error was sued out to review the
proceedings of the trial court.

In the first week of September, 1916, a fair was held at
Winfield, Iowa, at which Emma Larkins was employed at
an eating stand as a waitress.   While there she met C. D.
McPherson, with whom, apparently, she had become ac-
quainted at some fairs previously held in Iowa.   McPherson
was in charge of and showing trained ponies at these fairs.
Some time Sunday forenoon, September 10, 1916, McPher-
son and Emma Larkins started to drive in a spring wagon
from Winfield east to Aledo, Mercer county, Illinois, about
fifty miles from Winfield.   They crossed the Mississippi
river at Keithsburg, Illinois, and remained at that place
over night, registering at Mrs. Porter's hotel as man and
wife and occupying a room together.   The next morning
after breakfast they drove in a northerly direction to a farm
known as the Dixon pony farm, and from there drove to
Aledo, where they arrived about four o'clock P. M. on Sep-

tember 11, 1916.  They drove directly to the fair grounds and were shown the stalls that had been assigned to McPherson for his horses.  Here Emma Larkins left McPherson and went to look for some people she had worked with at the fair at Winfield and other places.  She returned in a short time to where McPherson was and engaged in a conversation with Ed. Greer, whom she had met at the Winfield fair and who was acting as stall man for the Mercer County Fair.  Later in the same day Emma Larkins and McPherson took a hack and drove to Aledo and to the Janes restaurant for supper.  After supper they went to the hotel across the street, where McPherson wrote some letters while Emma Larkins went down near the post-office to listen to a band.  She returned in a short time to the hotel and she and McPherson took the same hack back to the fair grounds, where McPherson remained all night.  Emma Larkins obtained her two suit-cases and rode back in the same hack to Aledo, where the driver took her to his sister, Mrs. Russell, where she remained all night.  The next morning this same hackman again took her and her suit-cases back to the fair grounds, where they arrived about eight o'clock A. M. on Tuesday, September 12.  Shortly after reaching the grounds that morning she met Greer, the stall man, and he assisted her in carrying her suit-cases to the secretary's office, where they were left.  These suit-cases were never taken out or called for by Emma Larkins but remained there until taken away by the sheriff of Mercer county during the investigation of the alleged crime.

The plaintiff in error, Bert Sapp, had brought a racing mare (Helen S) to the Mercer County Fair on the Saturday evening previous, for racing purposes.  Mike Ferguson was employed by him as care-taker of the mare.  Plaintiff in error was given by the fair authorities stalls Nos. 20 and 21.  They placed the mare in stall 21 and used stall 20 as a bunk-stall, for sleeping purposes.  They slept there Saturday, Sunday and Monday nights.  About half an hour after

Greer had gone with Emma Larkins to the secretary's office with her suit-cases he passed along by stalls 20 and 21, occupied by Sapp, which were located under the amphitheater. Greer testified that he saw Emma Larkins seated with plaintiff in error in one of the stalls, apparently the bunk-stall, which had been assigned to plaintiff in error. Greer had some conversation with plaintiff in error in reference to the bunk-stall. During this conversation Emma Larkins made inquiry of Greer as to the whereabouts of McPherson. So far as the testimony in the record shows she was never again seen alive outside of that stall. The evidence as to just what occurred in this bunk-stall is circumstantial. Ferguson, the care-taker of the horse, testified that on Tuesday morning after he had fed the mare he called plaintiff in error to get up. This was about seven o'clock. He then left the stall and walked around the grounds for an hour or more. These stalls were shut in with double doors, upper and lower. At the top of the lower door in bunk-stall 20 there was a hole. When Ferguson came back to the stall on Tuesday forenoon after his walk around the grounds he found the doors closed and a blanket hung on the inside of the door so that anyone passing on the outside could not see in. He rapped on the door and plaintiff in error put his mouth to the hole and said, "You can't come in now; go away for an hour and a half and come back." Ferguson did so and returned about eleven o'clock. The doors were still closed and he again rapped, and plaintiff in error told him there was a woman in there and that she had fallen in a faint. These stalls, as we understand the record, were built under the seats of the amphitheater. At the back end of the stall, far enough in for a person to stand upright, there was a partition across the stall. Through this partition there was a door extending back under where the seats gradually descended toward the ground. Apparently the roof of the stall at this point was not high enough to be used for horses. When Ferguson came back at eleven

o'clock plaintiff in error stated to him that the woman who had fallen in a faint. was back of this partition at the further end of the stall under the seats, which sloped from the ground upward and formed the roof of the compartment back of the stall proper. The feed for the mare, Helen S, was kept in bunk-stall 20, and it was necessary for Ferguson to go to the bunk-stall to get the feed. Ferguson, when he went into the stall at eleven o'clock, opened the door in the partition across the end of this stall and saw a body covered with a light blanket. He. suggested to plaintiff in error that a doctor should be called, and plaintiff in error said he had seen lots of women faint away like that. Ferguson then fed the mare and did not return till about three o'clock. He found the bunk-stall closed and. plaintiff in error sitting upon a trunk in the stall. He stated to Ferguson that the woman was getting along all right and that he would take her out on the grounds when night came. Shortly thereafter Ferguson left and did not return until about five o'clock. He found the doors of bunk-stall 20 still closed, and plaintiff in error reported to him that the woman was getting along all right and that she had had a good sleep. Ferguson went away and did not return again until about seven o'clock in the evening. When he came back plaintiff in error asked him to stay while he went to get something to eat, as he had nothing to eat all day. Plaintiff in error was gone for fifteen minutes and when he returned Ferguson went away .again. Ferguson came back about eleven o'clock that night, and when he made inquiry as to how the woman was getting along, he testified plaintiff in error reported "all right." Ferguson then went to bed and did not waken until half-past five the next morning.

Stall 19 under the amphitheater, next to bunk-stall 20, was occupied by Guy Haas and June Bond. They kept in the large front part of the stall a mare they had entered to race at the fair. These two men slept in the rear part of the stall back of the partition, under the seats of the

amphitheater, this part of the stall being similar to the one in which Ferguson saw a body covered with the blanket in bunk-stall 20. During the afternoon of September 12 and late that evening both these men heard a noise in the back part of bunk-stall 20, which immediately adjoined stall 19 and was separated therefrom only by a board partition. Both these witnesses described these noises as groaning, hacking or coughing sounds. About five o'clock Tuesday afternoon plaintiff in error was in stall 19 advising them how to care for their racing horse and helping them wash and bandage the legs of the horse. They inquired of him about the noises they had heard in the back part of bunk-stall 20, and he told them he had a friend in there sleeping off a drunk.

Plaintiff in error and Ferguson slept in the main part of bunk-stall 20 on Tuesday night. After Ferguson got up Wednesday morning he fed the mare and then came back to bunk-stall 20, and then plaintiff in error informed him the woman was dead. Ferguson testified he told him, "Now you are up against it; you have got yourself in a bad fix," to which plaintiff in error replied, "That's nothing; I will get out of this." In a few minutes plaintiff in error asked Ferguson to help put the body in the trunk in which some blankets, harness and other property had been brought to Aledo. Ferguson objected to this and said he did not like to handle a dead body, but plaintiff in error insisted and told him he would not get into any trouble if he would swear that he had never seen the woman. The two men then lifted the body and placed it in the trunk. Ferguson then went outside, and when he next returned to the stall plaintiff in error told him he was going to get a car and ship out the horse and stuff at once. From the evidence in the record it appears that plaintiff in error remained with the trunk until it was placed in the car at Aledo. The evidence also tends to show that when Ferguson and plaintiff in error were bringing the horse from some point not far

distant from Aledo there had been a railroad collision and the horse was injured or lamed in some way, so that plaintiff in error told Ferguson in the early part of the week that he did not think he would be able to race the horse at the fair, and that if he did not race her he would take her as soon as possible to Monmouth, where apparently he had his headquarters. In coming to Aledo with the mare plaintiff in error brought this same trunk in which Ferguson testified the body was placed, carrying in it the harness, blankets and other paraphernalia used in connection with the racing mare. The drayman Fred Riddell, who hauled plaintiff in error's goods to the fair grounds, identified the trunk and stated it weighed from 75 to 100 pounds at the time he took it from the car to the fair grounds; also that there was no trunk-till outside of the trunk with the property he hauled for plaintiff in error nor any sack of harness nor blankets. The drayman James Whiteside, who hauled plaintiff in error's property from the fair grounds to the car on Wednesday morning, September 13, stated that the trunk weighed from 175 to 200 pounds and that he helped handle it from the wagon to the car, and also stated that he hauled some loose property besides the trunk,—a gunny sack which felt to him as if it contained leather straps, perhaps harness or articles of that nature, and one other gunny sack which contained something else; that he also carried on this trip from the fair grounds to Aledo on his wagon a trunk-till outside of the trunk; that he assisted plaintiff in error to unload all of this material into a box-car at the C., B. & Q. railroad depot at Aledo. Ferguson, the care-taker, brought the mare Helen S to the depot, and she was also taken into this box-car with the property that the teamster had brought along with the trunk.

About one o'clock on Wednesday, September 13, the car carrying plaintiff in error, Ferguson, the racing mare and the property in question, including the trunk, was carried by the C., B. & Q. train going west from Aledo to a point

near the Mississippi river and then in a southerly direction
to Gladstone, Illinois.   Before the train left Aledo, the con-
ductor, McMillan, came to the car and insisted that plaintiff
in error purchase tickets.   After some debate about it plain-
tiff in error went with him to the depot, where tickets were
purchased to Monmouth, Illinois, and punched by the con-
ductor.   Plaintiff in error inquired of this same conductor
if his car could be taken by the same train to Burlington,
Iowa, and the conductor replied that he was late and he
did not see how he could do that.   It is argued by counsel
for the State that it was the plan of plaintiff in error to
have the car taken to Burlington over the Mississippi river
and then back to Monmouth, and the purpose of asking this
question was to see whether he could get to Burlington and ·
then get the east-bound train from Burlington to Monmouth,
and thus, in crossing the river, he would have an opportu-
nity to roll the body from the car into the river.   Be that
as it may, the car was set off by the train crew at Glad-
stone, which is a junction station a few miles east of the
Mississippi river on the C., B. & Q. railroad, on the main
line between Burlington, Iowa, and Monmouth, Illinois.   At
about six o'clock P. M. on the same Wednesday evening this
car was picked up by a train going east from Burlington to
Monmouth.   Ferguson, who was in the car with plaintiff in
error from the time it left Aledo until it reached Monmouth,
testified that shortly after the car passed Biggsville, the next
station east of Gladstone, plaintiff in error said to him, "We
are not going to bring the body to Monmouth; got to get
rid of it somewhere right quick," and shortly after added,
"Here is the place; come on; give it a push;" that they
then took hold of the blanket which was around the body
and rolled it out of the car door.   Ferguson testified that
he shortly thereafter saw plaintiff in error throw out a bun-
dle of clothing.   After the body was rolled out of the car
plaintiff in error re-packed the trunk, putting the till in.   The
car, when it reached Monmouth, was unloaded.   Shortly

after this freight train with this car passed Biggsville on
that evening there was found on the south side of the south
track of this railroad, about three-quarters of a mile east
of Biggsville, the body of a woman.   The evidence tends
strongly to show that before this train passed there was
no body at that point.   Shortly after this train upon which
plaintiff in error and Ferguson were traveling passed the
point where the body was found a freight train going west
passed this same point, and the fireman of this west-bound
train noticed a body lying south of the track and notified
the station agent at Biggsville, when he passed through, of
that fact.   The station agent, with another man, took a
hand-car and rode down and found the dead body.   He tes-
tified that he examined the ground all around where the
body was lying and could find no marks as if anyone had
been at the place where the body was found or that there
had been a struggle there.   He returned at once to the sta-
tion and notified the coroner of the county in which the
body was found and also another employee of the Burling-
ton railroad.   This latter employee went down to the place
where the body was and remained there until the coroner
came, shortly before five o'clock, when the remains were
taken to Biggsville and an examination made by the coroner,
and the body was then turned over to the undertaker.

When Emma Larkins went to the fair grounds on Tues-
day morning in Aledo she had on her hands three rings,—
one a plain gold-band ring and the other two with some
sort of white stone settings.   When her body was found on
the railroad track the following Wednesday night there was
only the plain ring on her finger.   Ferguson testified that
after they arrived at Monmouth on Wednesday evening
plaintiff in error told him he had a ring he was going to
pawn, and afterward gave Ferguson fifty cents which he
claimed he had raised on the ring.   At the time the body
was found on the railroad right of way there were a num-
ber of bruises or wounds on the head and the eyes were

very much discolored. At the post-mortem examination held by the coroner with the assistance of other doctors, two of the doctors testified that either of these wounds was sufficient to have caused the death of the woman. The body after it was brought to Biggsville was identified by C. D. McPherson, Mrs. J. M. Bearse, the mother-in-law of Emma Larkins, and Herbert Mattson, as the dead body of Emma Larkins. Mattson had met Emma Larkins at the Winfield fair and had there given her a card with his name and address on it. This card was found in a small purse in the bosom of the dead woman when her body was picked up on the railroad right of way. The railroad employees found a coat, hat and umbrella in a small creek a little distance east of where the dead body was found, and Mattson identified this coat and hat as those worn by Emma Larkins at Winfield. Mrs. A. C. Eckert, a sister of Emma Larkins, also identified a picture taken of the dead body as the picture of Emma Larkins. The clothing found upon the body was identified by several witnesses as the clothing of Emma Larkins. The clothing and other articles that were in the two grips which Emma Larkins had left in the office of the secretary of the fair were also identified as the clothing of Emma Larkins, placed by her in her grips at Winfield. The Sunday morning following the finding of the dead body plaintiff in error was arrested in Monmouth and taken by the sheriff of Mercer county to Aledo and was there charged with the murder of Emma Larkins. To the sheriff plaintiff in error denied that any woman had been in his stall at the fair grounds and denied that a body had been thrown from his car after passing Biggsville, claiming that his trunk was in the same condition when he left Aledo as when he came there.

The evidence tends to show that Emma Larkins was at the time of her death about twenty-two years old and had been following various fairs throughout Iowa in company with women who are claimed by counsel for plaintiff in

error to have been of doubtful character. There is also evidence tending to show that she had been in the asylum at Watertown, Illinois, for treatment for the excessive use of morphine, having been sent there by her mother-in-law, Mrs. Bearse. She had not been living with her husband for several years before her death. There is some evidence tending to show that he was, or had been before her death, an inmate of an institution in Iowa. The mother-in-law testified that Emma Larkins had sometimes gone under the name which she had assumed, Arline Arden, and that she gave that name when she went to the Watertown asylum. There is also some evidence by some of the attendants there that she bore hypodermic scars on both limbs. There were some hypodermic marks and scars found on one limb of the body found in Biggsville. There is some conflict in the testimony as to the color of the suit-cases which belonged to Emma Larkins. Some of the witnesses testified that the grips were black, while other testified that the grips were brown. We do not think the discrepancy in the testimony as to the color of these grips had any material bearing on the crucial facts of this case. The sister of Emma Larkins testified· that Emma Larkins had a mark from blood poisoning on her right thigh, and we think the evidence tends to show that such a mark was noticed on the dead body found east of Biggsville.

The principal objection, as we understand the argument of counsel for plaintiff in error, is as to certain of the instructions given and refused by the trial court. It is insisted that instruction No. ·6 given for the People is erroneous. That instruction reads:

"You are instructed that if you believe from the evidence, beyond all reasonable doubt, that defendant made an unlawful assault upon the deceased, Emma Larkins, which in its consequences naturally tended to destroy the life of said Emma Larkins, and that in making such an assault he did so beat, bruise or strike her upon the head and

did thereby mortally wound her upon her head, as a result of which she died, as alleged in said indictment, then the defendant is guilty of murder even though he had no intent to take her life when he so made said unlawful assault."

It is insisted that this instruction assumes that there was an assault made upon Emma Larkins which caused her death, and that it also assumes that the dead body found east of Biggsville on the railroad right of way of the C., B. & Q. railroad was the body of Emma Larkins; that these questions were vital to the proof as a part of the State's case, and that this instruction, in assuming these facts, was bound to mislead the jury. We think on a fair reading of that instruction it is not open to either of these objections. The first part of the instruction says, "if you believe from the evidence, beyond all reasonable doubt," etc. We think the natural construction of this instruction is that all the rest of the instruction depended upon this first clause, and that the jury would understand that they must believe from the evidence, beyond all reasonable doubt, all the other things stated in the instruction before finding the plaintiff in error guilty. This being so, there is no merit in any of the criticisms of counsel for plaintiff in error as to this instruction.

From the argument of counsel for plaintiff in error on this point and other points in their brief, they seem to insist that there must be direct evidence tending to show that plaintiff in error assaulted Emma Larkins and caused her death before he could properly be found guilty under the indictment. The indictment consists of three counts. The first count charges that plaintiff in error murdered Emma Larkins with a certain instrument or weapon the exact nature of which instrument or weapon is to the grand jurors unknown. The second and third counts were substantially the same as to the facts except that they charged the plaintiff in error had committed the murder by some means, instruments and weapons to the grand jurors unknown. Counsel for plaintiff in error argue that the first count of

the indictment should have been taken from the jury on
their motion because there was no proof of any kind on
the trial that any weapons or instruments were used to
make the wounds upon the head of Emma Larkins or that
said wounds were made by weapons or instruments to the
grand jurors unknown. It is true there is no evidence of
any kind in the record to indicate what weapon or instru-
ment was used to cause the death of deceased, but there is
evidence that the wounds upon the head were of such a
nature as to have caused her death, and there was no at-
tempt to prove the character of the instrument or weapon
used to cause those wounds. An indictment for murder
need not be more specific than the evidence before the grand
jury justifies, and is sufficient upon which to sustain a con-
viction where on the trial of the cause it does not affirma-
tively appear that the means or weapon were to the grand
jurors unknown. An indictment for murder based upon
facts as here alleged in said indictment will not sustain a
conviction when there is affirmative proof in the record
that such facts were known to the grand jurors. (*People
v. Hunt*, 251 Ill. 446.) The argument of counsel for plain-
tiff in error seems to be to the effect that direct proof must
be made on the trial, not only that the death of Emma Lar-
kins was caused by an instrument or weapon inflicting the
wounds on her head, but also that the character of the
weapon was to the grand jurors unknown. Of course, di-
rect testimony is not required to prove the means causing
the death of the deceased. The means and manner of death
may be inferred from the circumstances proved. We think
from the evidence offered it is clear that the weapon that
inflicted these wounds upon the head of the deceased was
to the grand jurors unknown, and it is not necessary to
produce any witnesses to swear that such fact was unknown
to the grand jurors, as the evidence in the record fully jus-
tified the conclusion of the grand jury that the means and
manner of death by the weapon or instrument used was to

the grand jurors unknown. Furthermore, the circumstantial evidence in the record justified the jury in believing that Emma Larkins was mortally injured by plaintiff in error in the manner charged in the indictment.

Some question is also raised by counsel for plaintiff in error as to whether the proof as to the dead body being that of Emma Larkins was sufficient to sustain the verdict. Circumstantial evidence may be resorted to for the purpose of proving the *corpus delicti* in the same way and to the same extent that it may for the purpose of connecting the accused with the commission of the offense. It often happens that neither of these can be proved by direct testimony and therefore they may be lawfully proved by circumstantial evidence, provided it is satisfactory. (3 Greenleaf on Evidence,—16th ed.—sec. 30; *People* v. *Spencer,* 264 Ill. 124.) The undoubted rule is, that before a conviction can be had the guilt of the accused must be so thoroughly established as to exclude every reasonable hypothesis of his innocence. (*People* v. *Ahrling,* 279 Ill. 70.) We think the evidence in this case as to the *corpus delicti* and as to the guilt of plaintiff in error is of such a conclusive nature as to prove, beyond a reasonable doubt and to a moral certainty, that the accused and no one else committed the crime charged. This disposes of the criticism of instructions Nos. 8 and 9 and certain other instructions of like character.

Counsel further insist that the court committed error in giving People's instruction No. 11. This instruction was a so-called impeaching instruction, and counsel apparently criticise the instruction because it used the words "successfully impeached," without defining what the phrase means. From a reading of the entire instruction the jury would clearly understand therefrom what was meant by "successfully impeached." This instruction is worded differently from the one criticised in the authorities cited by counsel. Furthermore, plaintiff in error's instruction No. 21 used the same phrase, "successfully impeached," without attempting

to explain in that or any other instruction what was to be understood by the jury by the phrase. This court has said that certain words in an instruction such as this cannot be criticised by one party when that party has used the identical words in an instruction given by the court on his behalf. *Harding* v. *St. Louis Stock Yards,* 242 Ill. 444; *Fleming* v. *Elgin, Joliet and Eastern Railway Co.* 275 id. 486.

Counsel also insist that instruction No. 5 given on behalf of the People was erroneous in that it attempted to set out at length the meaning of the words "reasonable doubt," and they also insist that under the reasoning of this court in *People* v. *Rischo,* 262 Ill. 596, this instruction must be held erroneous. The wording of this instruction is so different from People's tenth instruction in the *Rischo case* that we do not consider anything said in that opinion can be controlling here. We do not think anything said in instruction No. 5 for the People in this case as to reasonable doubt was contrary to the law or could have misled the jury as to its meaning.

The trial court refused the following instruction which was asked by plaintiff in error:

"The jury are instructed that the witness Mike Ferguson is what is known in law as an accomplice, and that while it is a rule of law that a person accused of crime may be convicted upon the uncorroborated testimony of an accomplice, still the jury should always act upon such testimony with great care and caution and subject it to a careful examination in the light of all other evidence in the case; and the jury ought not to convict upon such testimony alone, unless, after a careful examination of such testimony, they are satisfied, beyond a reasonable doubt, of the truth and that they can safely rely upon it."

This instruction is identical with one asked by the accused in *Hoyt* v. *People,* 140 Ill. 588, and this court said in that case that it was improperly refused. Relying on that decision it is argued by counsel for plaintiff in error

282 – 5

that the court erred in this case in refusing this instruction.
If Mike Ferguson, as shown by the evidence, was an ac-
complice, as that term is used in *Hoyt* v. *People, supra,*
then the instruction should have been given, but in our judg-
ment he was not such an accomplice under our statute. All
courts agree that an accessory before the fact is an accom-
plice within the rule requiring corroboration of the testi-
mony of an accomplice, but the authorities are not in har-
mony upon the question whether an accessory after the fact
is an accomplice within this rule. Where a statute abrogates
the difference between an accessory before the fact and the
principal, it by "implication preserves the distinction be-
tween accessories before and after the fact, and  *  *  *
the accessory after the fact is not an accomplice." (12 Cyc.
446.) "The weight of authority would seem to hold that
an accessory after the fact is not an accomplice whose tes-
timony requires corroboration." (1 R. C. L. 159.) Our
statute makes a plain distinction between accessories before
and after the fact. Accessories before the fact are consid-
ered as principals and punished accordingly, while an ac-
cessory after the fact can be punished by imprisonment not
exceeding two years and fined not exceeding $500. (Hurd's
Stat. 1916, p. 934.) Beyond question, upon the evidence,
Ferguson, if guilty at all, was an accessory after the fact.
Under the common law an accessory after the fact was
guilty of felony and was subject to the same punishment
as the principal. (4 Blackstone's Com. 39.) And this defi-
nition was referred to in *Cross* v. *People,* 47 Ill. 152, re-
lied upon by counsel for the plaintiff in error. The reason
that the weight to be given to the testimony of an accessory
after the fact under the common law (where the punish-
ment was the same as the principal) should be the same as
that given to a principal is obvious. Some of the authori-
ties have overlooked, in ruling on this point, the distinction
between an accessory after the fact under the common law
and an accessory after the fact under such a statute as ours.

A leading author on evidence defines an accomplice as one "who knowingly, voluntarily and with common intent with the principal offender unites in the commission of a crime." (1 Wharton on Crim. Evidence,—10th ed.—sec. 440;. see Jones on Evidence,—2d ed.—sec. 768, where the same definition is given.) This was clearly the understanding of the meaning of the word "accomplice" in *Hoyt* v. *People, supra,* for the court said with reference to the testimony of accomplices (p. 595) : "Such evidence is liable to grave suspicion and should be acted upon with the utmost caution, for otherwise the life or liberty of the best citizen might be taken away on the accusation of the real criminal, made either to shield himself from punishment or to gratify his malice; and thus it is said in 1 Phillips on Evidence (Cowen, Hill & Edw. notes,) page 111 : 'Accomplices, upon their own confession, stand contaminated with guilt. They admit a participation in the very crime which they endeavor by their evidence to fix upon the prisoner,' " etc. Where the distinction between accessories after the fact and accessories before the fact, and principals, is not clearly made by instructions, or instructions are refused which set out this distinction, this court has held it was reversible error. (*White* v. *People,* 81 Ill. 333; *White* v. *People,* 139 id. 143.) On the question of the competency and weight of an accomplice's testimony, the test and definition of an accomplice should be whether, on the evidence, a person so charged could be convicted as principal or accessory before the fact or as an aider or abettor. (*Levering* v. *Commonwealth,* (Ky.) 19 Ann. Cas. 140.) Under this test it is clear that an accessory after the fact is not an accomplice. (See *State* v. *Jones,* 115 Iowa, 113; *State* v. *Riddell,* 96 Atl. Rep. (R. I.) 530.) The punishment for an accessory after the fact being so different from that of an accessory before the fact, the temptation of an accessory after the fact to testify falsely to shield himself cannot be considered of the same character as the temptation of an accessory before

the fact or a principal. On reason as well as by the great weight of authority we think it must be held under statutes such as ours, distinguishing as to the punishment between accessories before and after the fact, that an accessory after the fact should not be considered an accomplice. (See authorities cited in note to *Levering* v. *Commonwealth, supra; State* v. *Phillips,* 5 Ann. Cas. (N. Dak.) 760; 1 Bishop's New Crim. Law,—8th ed.—secs. 690, 695.) Under the facts in this case we think the trial court did not err in refusing the instruction in question.

The rulings of the trial court on numerous other instructions are criticised. Counsel for plaintiff in error asked some thirty-four instructions. Nearly thirty of them appear to have been given without any modification. The remainder of the instructions that were asked were modified in a greater or less degree by the trial court and given. We think, taking the instructions as a series, the jury were fully and fairly instructed on all branches of the law as applied to the facts in the record. We find no reversible error in the giving or modifying of any of the instructions, but we do not deem it necessary to discuss in detail the various criticisms, as what we have already said disposes, practically, of all that we deem the important questions raised in the briefs of counsel for plaintiff in error.

On the evidence in the record and the rulings of the court we are of the opinion that under the law of this State the plaintiff in error had a fair trial and that no reversible error was committed. The evidence introduced justified the verdict of the jury.

The judgment of the circuit court will be affirmed.

*Judgment affirmed.*