LONNEY EVERETT

*v.*

THE PEOPLE OF THE STATE OF ILLINOIS.

*Opinion filed June 23, 1905—Rehearing denied October 12, 1905.*

1. CRIMINAL LAW—*when refusal of instruction as to rule of presumed innocence is not fatal.* Refusal of an instruction stating the rule of presumed innocence separately is not ground for reversal where the rule is correctly and clearly stated in another instruction, although in connection with some other proper rule or guide as to its application.

2. SAME—*when rule of presumed innocence is sufficiently presented.* The rule of presumed innocence is sufficiently presented to the jury in an instruction stating that "all the presumptions of the law, independent of the evidence, are in favor of innocence, and every person is presumed to be innocent until he is proven guilty."

3. SAME—*when the rule as to conviction on circumstantial evidence is sufficiently presented.* The rule concerning conviction on circumstantial evidence is sufficiently presented by an instruction stating that where conviction is sought on circumstantial evidence alone, "the People must not only show, by a preponderance of the evidence and beyond a reasonable doubt, that the alleged facts and circumstances are true, but they must be such facts and circumstances as are absolutely incompatible upon any reasonable hypothesis other than that of the guilt of the accused."

WRIT OF ERROR to the Criminal Court of Cook county; the Hon. R. S. TUTHILL, Judge, presiding.

RICHARD J. FINN, for plaintiff in error.

W. H. STEAD, Attorney General, JOHN J. HEALY, State's Attorney, and FLETCHER DOBYNS, for the People.

Mr. JUSTICE RICKS delivered the opinion of the court:

Plaintiff in error, together with John Gibson, John Gallion and Albert Johnson, was indicted at the October term of the criminal court of Cook county charged with the murder

of Henry Maskey. At the December term the defendants entered their plea of not guilty and the trial was entered upon. After it had proceeded for a time a *nolle prosequi* was entered as to defendants Gallion and Johnson and later a like order was entered as to the defendant Gibson. The trial proceeded as to the plaintiff in error, who was found guilty and his punishment fixed at imprisonment in the penitentiary for fourteen years. Motions for new trial and in arrest were made and overruled and judgment entered. From that judgment this writ is prosecuted.

On August 20, 1904, the employees at the Union Stock Yards were on a strike, and the plaintiff in error and many others were employed in the yards in the place of the strikers, and were called "strike breakers." They were taken to and from their work by special train. At about 5:30 o'clock P. M. of that day a train of nine coaches and engine, loaded with these so-called "strike breakers," many of whom were women, was passing down Fortieth street, east from the yards, toward the city. A majority of the passengers on the train were colored people. Emerald avenue crosses Fortieth street, and is a street running north and south and is of the width of about sixty feet. Approaching Emerald avenue from the west the train passed under a viaduct which carries traffic over Fortieth street at Emerald avenue. At that point Fortieth street is covered by many railroad tracks, and on the day in question Henry Maskey, the deceased, and several other persons, were standing on the south side of the crossing and others were on the north side of the crossing. A police officer had escorted five women to that crossing to take that train and placed them in custody of one John E. Kinsella, a switch watchman at that crossing, with directions to stop the train in order that the women might get aboard. When the train reached the crossing the switchman signaled it to stop, and it did stop, with the third car from the front of the train on the crossing. Maskey at that time was standing a little south of the train, leaning against a telegraph

pole. The train was heavily loaded—so much so that the platforms were covered with people and it was difficult to get access to them. One of the women attempted to get on the car, but in doing so lost her balance or in some manner fell back from the car and screamed. A signal was given for the train to move ahead and the woman fell just as the car started. Her screaming seemed to excite others there, and the evidence tends to show that other women there also screamed. The cars back of this third car were either under or west of the viaduct, so that the view was obstructed. While the evidence does not expressly so show, it is manifest that those on the train that were working in the stock yards anticipated an attack on the train by the strikers and the hallooing of the women caused a panic to start, which spread through the train. Immediately upon the screaming and the starting of the cars shooting began from the third car from the front, and as the various cars passed the crossing a number of shots were fired from each car, both on the north and south sides, until the third car from the rear was at the crossing, and as that car pulled on to the crossing the evidence shows that plaintiff in error went to the open window on the south side of the car and towards the center and extended his arm through the open window and fired three shots. Just at that time three persons were struck by bullets, namely, Henry Maskey, Dennis Ryan and Henry Hanson. They were all standing near each other. Ryan and Maskey were killed and Hanson slightly injured. Maskey was shot in the forehead and almost directly between the eyes, and died instantly. The bullet that killed him was from a thirty-eight calibre gun. There was no attack made upon the train, nor was there any threat or attempt to make one, so far as shown by the evidence, nor was there a shot fired other than those from the train. The evidence tends to show that there were from fifty to one hundred shots fired altogether, some witnesses placing the number of shots fired from the car alone in which defendant was, as high as fifty. It is manifest

from the evidence that there was much excitement and indiscriminate discharging of fire-arms by those on the train.

A reversal is urged upon the ground that the evidence does not sufficiently point out the plaintiff in error as the person who fired the fatal shot, and that the court erred in giving and refusing instructions. The shooting was without provocation or justification, and, so far as it was directed toward those standing in the street, was so reckless and wanton and in such utter disregard of human life that the law would imply malice.

When the *nolle* was entered as to the co-defendants of the plaintiff in error they were placed upon the stand by the People. Johnson testified that he was in the third car from the rear, sitting facing a lady on the south side of the train, and that as the car pulled on to Emerald avenue, Gibson and plaintiff in error passed between them and to the open window and began firing; that the lady got up and ran; that he knelt down between the seats to protect himself, and that three shots were fired, apparently over his head; that after the firing ceased he saw Everett take cartridges out of his stocking and hide them behind the seat, but did not see the revolver.

Gibson testified that when the shooting began he was standing in the third car, talking to other parties, and that the plaintiff in error came into the car and went to the open window and was firing his pistol; that just as Everett ceased firing he looked out of the window and saw the deceased, Maskey, lying down near a telegraph pole.

Gallion testified that he was down near the end of the third car from the rear when the shooting took place, and that when it ceased he got up and went toward the middle of the car and found Everett and Johnson sitting in seats on the south side of the car, facing each other; that he sat down by Johnson, and that about that time some one said, "Hide your guns—they are searching the car," and that he saw Everett put a gun, similar to the one in evidence, under his

216—31

seat, and that Everett then put his left foot on the seat, took some cartridges out of his stocking and rammed them down between the cushion and the back of the seat, and they fell through on the floor.

Kinsella testified that he stood near the train on the south side and was trying to get the women on; that when the women screamed, shooting began at the third car from the front and continued until after the third car from the rear had come upon the crossing; that in the third car from the rear, and on the south side and toward the center of the car, he saw a black hand extended through the window, holding a blue-steel gun, and that from it three shots were fired rapidly, and stated that the gun he saw out at the window resembled the gun in evidence. Then he heard some one halloo or exclaim "Oh!" and looked around and saw the deceased, Maskey, on the ground, and that those shots from the blue-steel gun were the last shots that were fired.

Henry Hanson testified that he was standing at the crossing and within three feet of Maskey. He describes the beginning of the shooting and its continuance substantially as does Kinsella. He says Ryan, Maskey and himself were all shot about the same time, and that when they were shooting, the third car from the rear was in the middle of the crossing at Emerald avenue. He says he saw a blue-steel gun coming out of the window of the third car from the rear and saw three shots fired from it; that one of these shots struck him and knocked him down, but he was able to get up immediately; that that ball struck a bar on his watch chain and its course was deflected by it, cutting the skin slightly and lodging in the lining of his coat. He swears that the gun he saw resembled the one offered in evidence.

When the shooting had ceased the train was pulled out from the crossing a short distance and held until the arrival of police officers, who searched the train for fire-arms. Officer John Tracy was one of those who searched the car in which plaintiff in error was. He testified that officers en-

tered at each end of the car and worked toward the center, and at about the center of the car he found Everett, Johnson and Gallion together; that Everett had his head out of the window and he rapped him with his club and told him to come in; that Everett came in out of the window and looked at him; that he lifted up the seat and found under it a blue-steel revolver, which was offered in evidence, of thirty-eight calibre, and also found under the seat, by the revolver, eight cartridges of thirty-eight calibre, and that the gun had in it three exploded cartridges and three unexploded cartridges. The evidence shows that the bullets that killed Maskey and Ryan and struck Hanson were of thirty-eight calibre. The officer also stated that in this car but two guns were found. Officer Enstrum helped search the car, and he found an Iver-Johnson revolver of thirty-eight calibre under the seat occupied by a colored woman named Sophia Johnson. It was loaded and did not appear to have been fired. There were a number of women in this car, but they were not searched. After the passengers got out of the train the cars were searched and six revolvers and numerous other weapons were found, but it does not appear whether any of them were found in this car.

The evidence, we think, sufficiently shows that other fire-arms were discharged in this car and also out of the windows of it, and do not attribute much probative force to the circumstance that the gun of plaintiff in error was the only one that was found having discharged cartridges in it. One-half hour had elapsed between the time of the shooting and the time of the searching of the cars, and there was plenty of opportunity to hide and transfer weapons from one car to another and re-load those that had been fired, if sufficient forethought had been exercised to do so. But from what has been narrated above it is quite clear that there was sufficient evidence before the jury to warrant the conclusion reached, if they gave credit to the witnesses. No witness was sought to be impeached. It is claimed that there were some contra-

dictions in the testimony of the witnesses for the People, and an examination of the record supports that contention; but the contradictions were not on material matters and not of such character as would authorize us to say that the jury was not warranted in giving credit and adopting the view it did.

Complaint is made of the refusal of the fourth and seventh instructions offered on behalf of the plaintiff in error. They announce the well known rule that the defendant is presumed to be innocent until his guilt is established by the evidence beyond a reasonable doubt, and that that presumption is not a mere form, to be disregarded by the jury at pleasure. No objection can be made to the instructions, either in form or in substance, and they might properly have been given. Their refusal is sought to be justified on the ground that in the fourteenth instruction given for plaintiff in error this language is used: "All the presumptions of the law, independent of the evidence, are in favor of innocence, and every person is presumed to be innocent until he is proven guilty." This fourteenth instruction was upon the question of reasonable doubt, and advised the jury that in making up their minds and solving the doubt it was their duty to bear in mind these presumptions of innocence. It is argued that there is a well recognized distinction between a reasonable doubt and presumption of innocence, and in support of this contention are cited *Coffin* v. *United States,* 156 U. S. 432, and *People* v. *Macard,* 73 Mich. 15. With this position no fault can be found, and it is conceded by the People. But the important thing to the plaintiff in error was that the rule of presumed innocence should be clearly stated to the jury, and if it was, although in connection with some other rule or as a guide in the application of it, it would not be necessary that the court should repeat and reiterate, the rule in separate instructions. We think that the rule is sufficiently and clearly stated in the fourteenth instruction, and it was not prejudicial error to refuse the fourth and seventh instructions.

Refused instruction No. 3 advised the jury that if they had a "reasonable doubt as to any one of the facts necessary to make out a case of the prosecution" they should acquit, and it is complained that as the jury were instructed, for the People, that the reasonable doubt that would justify an acquittal must be as to the guilt of the accused on the whole evidence and not as to any particular fact in the case, the plaintiff in error was prejudiced by the refusal; and in this connection it is said that the vital question was whether either of the shots fired by the plaintiff in error caused the death, and that the evidence was so confused and conflicting that the jury should have been clearly instructed upon the question. Instruction No. 13 given in behalf of plaintiff in error told the jury that though they might find that the plaintiff in error fired one or more shots, still, before they could find him guilty they must also find, beyond a reasonable doubt, that one of the shots so fired by him was the cause of the death of the deceased, or that the plaintiff in error was aiding, abetting or assisting the one who caused the death of the deceased. We think that instruction sufficient to direct the attention of the jury to the necessity of the proof showing that the particular shot fired by the plaintiff in error must have been the one that produced the death.

In this connection it is also urged that this instruction No. 13 should have been given without the addition of the expression, "or that said defendant was aiding, abetting or assisting the one who caused the death of the deceased." It is said there is no evidence that there was any combination or conspiracy or joint action, and we are disposed to the view that upon this contention of fact the plaintiff in error is right. The occupants of these cars seem to have been unnecessarily and unreasonably excited and to have carelessly begun and kept up the shooting, but we do not think that there is any evidence, circumstantial or otherwise, showing that there was any combination, understanding, conspiracy or joint action, but that each was doing what he thought the

circumstances required, but that there was no reasonable foundation for any such belief or action. We cannot say, however, that the added phrase or expression did affect or could seriously have affected the plaintiff in error in view of the evidence, which seems sufficiently explicit, if credited, to point him out as responsible for the death.

Defendant's refused instructions Nos. 10 and 11 were upon the rule of circumstantial evidence, and No. 10 told the jury that the circumstances must be of such character that they could not reasonably be true, in the ordinary nature of things, and the defendant be innocent. No. 11, though worded differently, was to the same effect. The court did give instruction No. 21, which was:

"The court instructs the jury, as a matter of law, that where a conviction for a criminal offense is sought upon circumstantial evidence alone, the People must not only show, by a preponderance of the evidence and beyond a reasonable doubt, that the alleged facts and circumstances are true, but they must be such facts and circumstances as are absolutely incompatible upon any reasonable hypothesis other than that of the guilt of the accused."

This instruction, we think, fully covered the question, and we cannot conceive of any declaration of law more pointed or emphatic than the latter part of the given instruction, where the jury are advised that the facts and circumstances must be such as are absolutely incompatible upon any reasonable hypothesis other than that of the guilt of the accused. It would matter little how many times that 'thought was expressed. Its clearness could hardly be added to, and with this instruction given there was no occasion for the refused ones.

The evidence in the record, while in non-essentials somewhat conflicting, we think as a whole pretty clearly and distinctly shows that the fatal shot was fired from the car occupied by the plaintiff in error. There is no evidence showing or tending to show that more than one or two re-

volvers were fired out of that car from the south side. The question primarily was one of identification, and if the witnesses for the People were believed by the jury their evidence was rather direct than circumstantial, and if doubt might be cast upon the absolute verity of that direct testimony as to the matter of identification, the circumstantial evidence was so strong that we would not feel disposed, upon the whole case, to disturb the verdict for mere technical error.

　　Finding no error which seems to us to require a reversal, the judgment of the criminal court is affirmed.

*Judgment affirmed.*