(No. 20656.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* LESTER BUGG, Plaintiff in Error.

*Opinion filed June 18, 1931—Rehearing denied October 7, 1931.*

THOMAS F. SMITH, (HENRY F. TURNER, of counsel,) for plaintiff in error.

OSCAR E. CARLSTROM, Attorney General, MYRON MILLS, State's Attorney, and J. J. NEIGER, for the People.

Mr. JUSTICE DUNCAN delivered the opinion of the court:

Plaintiff in error, Lester Bugg, (herein called defendant,) was indicted by the grand jury of Cass county for the larceny of twenty hogs, the property of James Maslin. The trial resulted in a verdict of guilty. The jury found the value of the property stolen to be $230 and the age of defendant to be twenty-six years. After his motions for a new trial and in arrest of judgment had been overruled defendant was sentenced to serve an indeterminate term of from one to ten years in the penientiary. He has sued out this writ of error for a review of the record.

Defendant contends that the evidence is insufficient to sustain the verdict, that incompetent evidence was introduced by the People over his objection, and that the court erred in modifying an instruction offered by him and in refusing to give the instruction as offered.

James Maslin, Harold and Alef Boatman, two brothers, and H. J. Butzkeuben, cashier of the Illinois State Bank of Quincy, testified for the People substantially as follows:

James Maslin: In the latter part of May, 1930, he had 315 hogs in a forty-acre pasture near the railroad station of Little Indian, in Cass county. The pasture was located immediately west of the right of way and tracks of the Jacksonville and Havana Railroad Company. The railroad depot was opposite the northeast corner of the pasture. The pasture was fenced on the north, west and south with woven-wire fencing. On the east side there was a board fence with woven wire stretched over the boards. On June 2, 1930, there were 313 hogs in the pasture, two having died. The hogs on an average would weigh from 130 to 150 pounds each. On that day the fair cash market value of hogs was ten cents a pound. On June 15 he counted the hogs and found only 268—45 being missing. He found

a place in the fence on the east side of the pasture, near the southeast corner, where the two bottom boards of the fence had been broken out and the woven wire folded up. Tracks and signs there indicated that hogs had been driven out of the pasture at that place and onto the railroad right of way and thence south and east for about a mile and a half to a point on the county line between Cass and Morgan counties, on a public highway running north and south. At the latter point there was a bank about four feet high on one side of the highway. The tracks there indicated that the hogs were driven onto this bank and loaded onto a truck that had been backed up to the bank. At this point there was found a gate that might have been used for making a chute to load the hogs into the truck.

Harold Boatman: He lived in Beardstown. He was acquainted with defendant, who lived in Ashland and ran a restaurant and lunch room there. On the afternoon of June 2 witness went to Ashland and saw defendant standing in front of his restaurant. There was an oil station near the restaurant. Alef Boatman was at that time working on a truck at the oil station. Defendant and witness had a conversation. Defendant said that he and Alef were going out that night and get some of Maslin's hogs and asked witness if he would go with them. Witness answered that he had to go back to Beardstown. Defendant then told witness that they would not start until about 10:00 o'clock and suggested that he go to Beardstown and come back. Witness agreed to go with them. He went to Beardstown and returned to Ashland between 9:00 and 9:30 o'clock in the evening and there saw defendant and Alef. He then drove his car out to the Allroyd place and stopped beside the road and went to sleep. After a while Alef and defendant came along and Alef awakened witness. Alef was driving his car and defendant was driving a Graham Bros. truck that belonged to him. Alef parked his car near witness' car and he and witness got in the truck

with defendant. They went down the road to the Anderson place, where defendant and witness got out of the truck. Alef drove the truck down the road to the county line. He left the truck there and came back and joined witness and defendant. They then went in a northwest direction across some fields to the railroad and up the railroad to Maslin's pasture. They took about twenty hogs out of Maslin's pasture through an opening that they made in the fence near the southeast corner of the pasture. They drove the hogs onto the railroad right of way, down the railroad for about a quarter of a mile, across a field of oats or wheat and a pasture, and into the road on which the truck was located. After the hogs had been driven across a bridge over Little Indian creek defendant and Alef went ahead to fix the truck for loading the hogs. Witness drove the hogs onto a bank at the side of the road and by making a chute with a gate they loaded the hogs onto the truck, which had been backed into the bank. Witness and Alef rode in the truck back to the place where they had parked their cars and there got out of the truck and drove their cars to Beardstown. They got a lunch at a restaurant and then went in witness' car to a baseball diamond on the State road just outside the city limits of Beardstown. They met defendant there and Alef got in the truck with defendant. Witness told them that he could not go with them. They said that that was all right—that they would take the hogs and sell them and give witness his share of the money when they came back. Witness then went home. The next day Alef gave him $70.

Alef Boatman testified concerning the taking of the hogs from the Maslin pasture by himself, defendant and Harold Boatman on the night of June 2, 1930, substantially to the same effect as did Harold. He also stated that either 20 or 22 hogs were taken, and that they were small and would weigh between 125 and 180 pounds each. When he and defendant left the ball park outside the city of Beards-

town with the hogs in the truck it was between 2:00 and 3:00 o'clock in the morning. They drove to Quincy and arrived there between 7:00 and 8:00 o'clock. They took the hogs to Armour & Co.'s plant and unloaded and sold them. Defendant told the man at the plant that his name was W. L. Jones. Defendant went into the office and came back to the truck with a check. They then drove the truck "uptown." Witness saw defendant write the name "W. L. Jones" on the back of the check. Defendant went into the Illinois State Bank, on which the check was drawn, to get the check cashed. After a while he came out and said that he could not get the check cashed and that they would have to go back to Armour's and get a letter of identification. They went back to Armour & Co.'s plant and defendant went into the office. He came out shortly with a letter. They went back to the bank and defendant got the check cashed. People's exhibit "A" was identified by witness as the check which defendant indorsed with the name "W. L. Jones." It is a check dated June 3, 1930, on the Illinois State Bank of Quincy, for $232.05, payable to W. L. Jones and drawn by Armour & Co. by J. N. Kofron and indorsed "W. L. Jones." It has on its face the initials "H. J. B." and is perforated "6-3" and "70-54." After defendant had cashed the check they drove back towards Beardstown. While on the road defendant figured expenses of the trip and gave witness $140 for his and Harold's share of the proceeds of the sale of the hogs. When they got to Beardstown witness got out of the truck and went to his brother's home. This witness stated that he was under indictment for larceny of the hogs and that he had not entered his plea to the indictment.

H. J. Butzkeuben: He was assistant cashier of the Illinois State Bank of Quincy; that his initials appeared on the check, People's exhibit "A;" that he put his initials on the check when the person presenting it was referred to him after the paying teller had refused to cash the check

because the person presenting it was unidentified; that the man who presented the check was referred back to Armour & Co. for identification; that he returned later with a note from the agent of Armour & Co. and the bank cashed the check, and that while the defendant's face looked like one that he had seen before he could not say that defendant was the man that presented the check.

Defendant denied any participation in or knowledge of the crime alleged in the indictment. He also testified that Harold Boatman worked for him at one time and later Alef Boatman worked for him; that he did not remember seeing Harold on June 2, 1930; that he saw Alef on that day at the filling station near defendant's lunch room before noon but did not see him after noon on that day; that he was at his lunch room all day on June 2, 1930, and all night; that he did not leave the lunch room after 9:00 o'clock that evening; that Mr. and Mrs. J. S. Barker were at his lunch room on the night of June 2 from supper time until 11:00 o'clock; that he owned a truck on June 2 that was then equipped for hauling shale; that it did not have a "stock box" on it; that he did not sign the name "W. L. Jones" on the back of People's exhibit "A" and never saw that check before the trial, and he had never seen witness Butzkeuben until he was called as a witness at the trial.

John S. Barker testified for defendant as follows: He is a resident of Peoria but lived at Ashland from August 5, 1929, to August 5, 1930, and during that time was the manager of an oil station which was located near defendant's lunch room. He recalled the second day of June, 1930, because on that day his sister and her husband, who had been visiting at his home in Ashland, returned to their home in Peoria. Witness was at the oil station on that day and saw defendant at his lunch room at various times during the day. He did not see Harold Boatman at the oil station or lunch room during that day but did see Alef Boatman there at one time on that day. Witness and his wife

ate supper at defendant's lunch room about 6:00 o'clock in the evening of that day and stayed at the lunch room until 11:00 o'clock, or a few minutes after, that night, at which time he and his wife went "up-town" to get a young lady who roomed at their house and take her home from work. Witness went to the lunch room "as early as possibly somewhere between 5:00 and 7:00 o'clock" on the morning of June 3 and defendant was there at that time. Defendant had a truck on June 2 which had a platform on it. He had been using it to haul shale. The truck had no standards on it.

Emma Barker testified that she and her husband were at defendant's lunch room from about 6:00 o'clock until after 11:00 o'clock on the evening of June 2, 1930. Defendant was there during all that time.

The foregoing is the substance of all the evidence introduced on the trial. Defendant contends that since the only testimony to establish his guilt is that of self-confessed accomplices, which is subject to grave suspicion, there is a reasonable doubt of his guilt and the judgment should therefore be reversed. That the testimony of an accomplice is subject to grave suspicion and should be acted upon with great caution is a principle well established by the decisions of this court. (*People* v. *Rongetti*, 338 Ill. 56; *People* v. *Harvey*, 321 id. 361; *People* v. *Johnson*, 314 id. 486; *People* v. *Pattin*, 290 id. 542.) While such testimony must, as a matter of law, be considered with suspicion and acted on with great caution it is competent evidence, and if, when all the circumstances are considered, such testimony is believed by the jury to be true and is of a character to prove guilt beyond a reasonable doubt, it will authorize a verdict of guilty. (*People* v. *Looney*, 324 Ill. 375; *People* v. *Schallman*, 295 id. 560; *People* v. *Frankenberg*, 236 id. 408; *Juretich* v. *People*, 223 id. 484.) The reason that such evidence is subject to suspicion and should be accepted with the utmost caution is that a reasonable inference arises

that such testimony is given under a promise of immunity or a reasonable hope of escaping prosecution or of obtaining some leniency. These are matters which go only to the question of the credibility of the witnesses, and of this question the jurors are the sole judges. (*People* v. *Looney, supra.*) In this case the jury were cautioned in the instructions of the court to treat the testimony of the accomplices with suspicion and to act upon it with caution. It was for the jury to determine the credibility of the witnesses and the weight of their testimony. After carefully considering all of the evidence in the record we cannot say that the verdict is palpably contrary to the weight of the evidence or that the evidence for the People is so unreasonable, improbable or unsatisfactory as to justify a reversal of the judgment on that ground.

It is contended that the court erred in admitting in evidence People's exhibit "A" over defendant's objection. We might dismiss this contention with the statement that the abstract of the record prepared by defendant does not show that he interposed any objection to the introduction of this exhibit and does not show that the exhibit was ever introduced in evidence. We will, however, assume that the exhibit was introduced over defendant's objection. The contention is that the testimony of the accomplice Alef Boatman that defendant wrote the name "W. L. Jones" on the check was insufficient to authorize the admission of it in evidence, and that the State's attorney should have been required to make further proof that defendant indorsed the check by making proof of the handwriting of defendant under the provisions of "An act concerning proof of handwriting and to permit proof of handwriting to be made by comparison," approved June 23, 1915. (Laws of 1915, p. 440.) In permitting the introduction of exhibit "A" the court committed no error. Alef Boatman had testified that it was the check received for the hogs and that it was indorsed in his presence by defendant with the name

"W. L. Jones" and was cashed by defendant. That was sufficient evidence to identify the check and make it competent and relevant evidence. Whether or not the evidence of Alef Boatman was worthy of belief was a question wholly for the jury, and it was not necessary for the court to determine, as seems to be defendant's contention, that there was proof beyond all reasonable doubt that the indorsement on the check was in defendant's handwriting before the check could be admitted in evidence. The act of June 23, 1915, does not, and does not purport to, prescribe an exclusive method of making proof of handwriting, and the State's attorney was under no obligation to attempt to prove that the indorsement on the check was in the handwriting of defendant by the method authorized by that act.

In an instruction offered by defendant the jury were told that they should carefully consider all of the evidence bearing on the question of alibi together with all the other evidence in the case, and that if, after considering all the evidence on that issue, together with all the other evidence, there should arise a reasonable doubt as to the guilt of defendant they should find him not guilty. The instruction then concluded with the following paragraph, to-wit: "The court further instructs you that the defendant is not as a matter of law, required to prove his defense of an alibi, beyond a reasonable doubt, and he is not required to prove such defense by the greater weight of the evidence. It is sufficient if the evidence on that point raises a reasonable doubt in the minds of the jurors as to whether the defendant was present at the time and place of the commission of the larceny charged." The court modified this instruction by striking out the paragraph quoted and then gave the instruction as modified. Defendant contends that it was error to refuse the instruction as offered. Where the defense of alibi is interposed, it is, as in other cases, the doubt as to defendant's guilt, and not as to his whereabouts at the time of the commission of the crime, that authorizes a verdict of not guilty. There was no error in

modifying this instruction. (*People* v. *Robinson,* 308 Ill. 398.) The jury were by the instructions given by the court fairly and fully informed as to the law of the case.

The record shows that defendant had a fair and impartial trial, in which there was no error committed prejudicial to him.

The judgment of the circuit court is affirmed.

*Judgment affirmed.*