(No. 22605.—▮▮▮▮▮▮▮)

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* MAY HANSON, Plaintiff in Error.

*Opinion filed February 15, 1935.*

J. E. GOEMBEL, and FRANK H. HALL, for plaintiff in error.

OTTO KERNER, Attorney General, ROBERT E. NASH, State's Attorney, J. J. NEIGER, A. B. LOUISON, and MAX A. WESTON, for the People.

Mr. CHIEF JUSTICE JONES delivered the opinion of the court:

May Hanson was indicted in the circuit court of Winnebago county for the murder of her former husband, Earl C. Hanson. Upon a jury trial she was convicted and sentenced to the penitentiary for fourteen years. She attempted to bring the cause to this court by appeal. Upon a motion by the People to dismiss the appeal and a countermotion by her, she was allowed to attach assignments of error to the record and the cause is before us as upon writ of error. She will be hereinafter referred to as defendant.

Defendant procured a divorce from her husband December 22, 1932. After that date defendant and their daughter, June, aged twelve years, lived about six miles north of the city of Rockford. A proper understanding of the case requires quite a detailed recital of facts and circumstances. The house is on the north side of an east and west road about forty rods east of a paved highway

known as the Main street road. Near the west line of the driveway is a line of shrubbery and small trees extending from the gate back to a point opposite the garage. The approximate height of the shrubbery is five feet, the same varying from three and one-half feet to seven feet. There is a two-wire fence along the east side of the drive from the road fence to a point opposite the front of the house. For several months prior to his death the deceased had been in the habit of having the custody of June on alternate Saturday afternoons and Sundays. She was with him on Sunday, August 13, and they returned about 9:00 o'clock that night in his 1929 Ford coupe. She testified that they went to church in the morning, had dinner and went to two picture shows, one of which was in the evening. On the way to her home they stopped at a filling station and Hanson had the tank of his car filled. He had planned to take his daughter to Chicago the next morning for a stay of two days. Her mother had made one new dress for her and purchased another, both of which were placed in a night-pack to be taken on the trip. Hanson drove his car to the front door of the house and let his daughter out without stopping the motor. After bidding him good-night June went into the house. He was smoking a cigar the last time she saw him. In the house June called "Mom" twice but received no answer. She thought her mother might be up-stairs and started up the stairway. A light through the front window of the sun parlor attracted her attention. She saw a burst of flame, and at first thought her father had turned on the lights of his car quickly. Then she saw the car in flames on the driveway. She did not see or hear her mother and ran out of the house the same way she came in. She did not stop to close the front door and thought it slammed. The car was then standing at the end of the lane, by the gate and the road. Her father was lying on the west side of the driveway. His clothes were on fire, his hair sizzling, and he

was moaning. She ran to a neighbor's across the North Main street road and told them to call the ambulance. The car was all afire before she started to get help. Her father was in good health when they came home and there was nothing wrong with the car. She testified that the car windows were open, and that if she remembered rightly the wind-shield was open about four or five inches. When she returned, her mother was standing at the corner, east of the sun parlor window. Bruce Thompson was there. Two brothers whose last name is Dion soon arrived. Deceased was still lying on the west side of the driveway. Someone put a blanket or canvas over him. Several more people soon came. There was a burned spot in the grass a short distance north of the open gate, with parts of the burned clothing around it. A corn-cob pipe was found near by. Hanson was about three feet north and slightly to the left of the automobile. He was badly burned and died in the lane adjacent to the driveway. The burns involved the head, neck, left arm, left shoulder, left side of the legs and body, his hands and ankles. The skin on the neck and left side of the chest was black and charred crisp. The burns extended down into the tissues and muscles. In places the skin was gone, and on his hands it was curled up "like loose bark on a tree." The eyelids were entirely gone and the margins of the ears deeply burned. The lips and tongue were swollen and the tongue protruded. There were no burns on the inside of the left leg, the groin, buttocks, genitalia, front of the chest or abdomen. Dr. Palmer, a practicing physician and pathologist at the Rockford Hospital for over five years, testified that the burns were sufficient to cause the death of Hanson; that he would not say they did cause it, but they were sufficient to cause his death.

The hub of the left rear wheel of decedent's car was lodged against the west gate post and had made a dent in the post. The hub cap was found near by. The spinning

of the wheel at the side of the post had worn through the grass and sod. The car was in gear and was pulled away from the gate post and dragged back a car's length while it was still burning. The top and all inflammable material on the inside of the car were burned. The wind-shield glass was melted. The floor boards, battery lead straps and cable insulation were burned. The float of the carburetor was melted apart and the ventura melted off. The door panels were burned within two inches of the bottom. The rubber mat on the steel left running-board was burned under the left door for a space of about five by thirteen inches. The car fenders and the splash-board under the left door were not burned. The sides of the hood were slightly scorched. The glass in the gauge on the instrument panel was cracked, and the right end of the top seam of the gas tank next the instrument panel was slightly open for a space of four or five inches. Water was put in the tank after the fire. For five days the cracked gas-gauge glass showed no leak. Thereafter it leaked a drop at a time. The distributor cap, the roller, the condenser, some of the wiring, the top of the hood and the top hose connection to the radiator were burned. The finish on the rear deck was completely gone. The fan belt, the gas line, the switch at the foot of the steering wheel and the motor were normal, with grease still on the motor. Five keys, some of them partly melted, were found on the transmission. The ignition switch was melted. Millard F. Stockburger, deputy sheriff, testified that at the time of the fire the wind-shield was closed and the glass melted. An expert mechanic who examined the car after the fire corroborated his testimony.

On the night of the fire, Stockburger and Ernest Smith, a special deputy sheriff, found a porcelain bowl in the field from twenty to twenty-five feet west of the west line and about sixty-three feet north of the south line of the premises. It was about ten inches wide and four and one-half

inches deep, with curved sides. Evidence was produced which tended to show that a liquid had been burned in the bowl while it was held at a slight angle, and that burning gasoline would produce the condition in which the bowl was found. There was no discoloration on the grass under the bowl and no dew on the grass. They found red berries on the bushes along the west fence and freshly crushed berries on the ground under one of the bushes. The next morning they found a penny box of domestic safety matches on the ground, east of the bush. The box was about seven feet from the west line of the premises and about sixty feet from the front fence, almost due east of where the bowl was found. About fifteen feet south of it there was another spot where the grass was burned seven or eight inches wide and about eighteen inches long. The match-box had a single scratch about one and one-half inch long on the abrasive substance on the side of the box. Three more boxes of the same brand of matches were found on the kitchen shelf in the house and an empty match-box of the same kind was found in the kitchen waste basket. Defendant told Stockburger she did not know how the bowl or the box of matches came to be where they were found. She admitted that a few days previously she had purchased five boxes of the same brand of matches as the one found. She said that the bowl was one of two she owned; that she had used it to water the chickens at 6:30 o'clock on the evening of the fire and had put it in the chicken coop, a few feet inside the door. Stockburger found a pan of water inside the door of the chicken coop and another in the chicken yard.

At about 4:00 o'clock P. M. on the day of the fire Mrs. Hanson purchased a gallon of gasoline from a filling station about fifty rods west of the Hanson property. The attendant furnished a red can. He testified that she said she wanted to try to start her car; that she then went for a ride with a lady, taking the gasoline with her; that

they returned about 6:00 o'clock and Mrs. Hanson walked home, carrying the gasoline. The next day Stockburger and the State fire marshal went to defendant's premises. They found the red gasoline can in the garage, with filler and spout-caps screwed on. The fire marshal testified that it was about two-thirds full. Stockburger testified that it was afterwards measured and found to contain a little less than a half gallon. The tires on the Chevrolet car which was in the garage were down. Stockburger tried the battery and it was apparently dead. He measured the gasoline in the tank with a stick and found it was approximately two inches deep. The tank was about thirty-two inches long and about eleven inches high. Defendant admitted to him that the gasoline in the red can was purchased by her the day before. She told him she had not used the car for several months, and that it needed a new battery and tires and the teeth were out of the starter gear.

There were stains on the dress worn by defendant on the night of the fire similar to stains which could come from crushed berries of the bushes along the driveway. She wore a dark coat that evening. It was singed on the right side and right front from the collar down to within about two inches above the bottom, except a small area about four inches above the pocket, with some singeing on the left side of the collar. Her eyebrows, eye-lashes and the hair on her forehead were singed, continuing back on each side over the temples. Her neck and both hands were singed, having a definite smoky appearance. The skin on the back of her hands was slightly reddened. The burns were less than first degree burns.

The theory of the prosecution is that when the decedent and his daughter came home defendant was hiding in the shrubbery with a bowl containing a part of the gasoline she purchased a few hours earlier, and that after June went into the house defendant threw the gasoline on decedent and lighted it, causing his death.

Defendant testified that about 9:00 o'clock on the night of the fire she was in the laundry room of the cellar sorting soiled clothes; that she had been there about fifteen minutes; that she knew Hanson would return at 9:00 o'clock, because he had always been prompt in returning; that she was not quite through sorting clothes when she heard a door slam and went up-stairs almost immediately because she wanted to speak to him; that through the window she saw the outside lighted up; that she went from the kitchen to the dining room, which leads to the west entrance, and called "June," but received no response; that she went to the front door and saw the fire; that the car was at the extreme end of the lane leading into the premises; that she went down to the car, thinking June was in it, and immediately got up to the side of the wind-shield; that the flames hit her face and she turned; that she was on the side of the car towards the east; that when the flames hit her face she was sort of stunned for a minute; that she turned and was not able to look on account of the smoke; that the heat was terrific, and she went back about twenty feet toward the house to get out of the heat and flames; that she started back a second time to the car, and Bruce Thompson told her to get away from there because it might explode; that she did not know at the time that her coat was singed, but she received two severe burns on her face and her neck was reddened; that Thompson was the first person she saw; that she told him to get the canvas cover off the swing to cover decedent; that later she also got a quilt; that the canvas cover was placed over the body, but it caught fire, and that she drew some water and someone took it to extinguish the blaze. She also testified that she did not kill decedent nor aid, abet or assist in his killing.

The coroner found piles of clothing in the laundry sorted as defendant told him. Two days after the fire

Stockburger told her of finding the crushed berries. She told him she had been looking for little shoots and sprouts in the bushes. She also showed him a bouquet of twigs of berries on the mantle over the fire-place. She testified that she told him she picked them from the bushes on the day of the fire and had undoubtedly crushed the berries. At his request she told him where he could find the dress and the coat she wore on the night of the fire. The dress was at her sister's house and the coat was at her own home. The coroner testified that on the night of the fire she answered all questions unreservedly. When Ernest Smith, special deputy sheriff, took June to the court house defendant went along voluntarily.

Defendant contends that the testimony shows the car may have taken fire from back-firing, or that, due to some intrinsic defect, escaping gasoline vapor may have been fired by a short circuit or by decedent's lighted cigar, and that in any event the evidence does not establish her guilt beyond a reasonable doubt.

Bruce Thompson, who lived about one hundred yards west of the Main street road, testified that he heard "hollering" and looked out of the window and saw the fire at Hanson's. There was a fairly good-sized blaze coming up in the air about fourteen feet. It appeared above the shrubbery but not above the trees on the west side of the Hanson property. On his way to the fire he saw June going into the Dion driveway. When he reached the premises the car was burning as before. Defendant was standing in front of the sun parlor. She said to him, "My God! I think June is in the car burning!" He did not tell her he had met June but told her later. He noticed burns on the right side of her face. She did not tell him how they got there. Four or five minutes after he arrived defendant suggested placing the canvas over the body, which he did. He was close to the car when he put the canvas over the body but the heat did not hinder him much. He did not

testify that he said anything to her about getting away from the car because it might explode.

Gunnard Lindstrom, a piano maker and salesman, was driving from Beloit to Rockford on the North Main street road and saw the fire. At first it looked like a brush fire. He continued to drive south, and shortly before he reached the corner a column of fire from the same spot broke through and went up to about the height of a telephone pole. When he arrived at the premises the column had died down and the whole inside of the car was afire and red-hot.

Philip Dion, the neighbor to whom June ran for help, testified that his wife called the ambulance. He went into the basement, put on his shoes and went to the Hanson place. June had already returned. Defendant said to him, "My God, Phil! What will happen to June and I next?" He first noticed the fire while he was in his own yard. It looked like a bonfire, and the closer he got the more flame he could see. When he first saw it the flames seemed to go up nearly to the telephone wires. Seemingly there was a small stream of fire. When he reached the premises the whole car was afire. He did not notice any fire outside of it. Fire was coming out of the gasoline tank and they were afraid it would explode.

Alfred Dion, who lived about six hundred feet south of his brother, Philip, testified that his attention was first attracted to the fire while he was in his front yard. He heard a woman scream, "My June! My June is burning up!" or "My son! My son is burning up!" The fire appeared about three feet above the intervening cornfield and looked like a bonfire. After he reached the Hanson place he noticed a flame shooting up from the gasoline tank and flames were coming from inside the car. He first suggested placing something over the body.

George McLain, a wholesale lumber salesman, testified that he was driving south on the Main street road and first saw a circular flame shoot into the air twelve or fifteen

feet. When he reached the Hanson place the car was burning on the inside and a pressure flame coming from the gasoline tank.

Ralph Anderson arrived at the premises after the car was moved outside the gate. At that time the cushions and top of the car were still burning, and he did not notice any flame from the gasoline tank.

The two parts of the filler-cap were unsoldered and the upper part was found on the cowl about three inches east of the opening. It is not within the range of probability that it could have lain there while the car traveled any considerable distance or up the incline into the yard. Walter Bengston, an expert mechanic, testified that a fire which consumed the floor boards would go into the engine compartment; that it could ignite the gasoline in the carburetor, melt the float, feed the gasoline down and cause a blaze that would boil the gasoline in the tank, forming a vapor that would burn. A fire of that kind would melt the solder in the center of the two parts of the filler-cap and the gas pressure inside the tank would remove the upper cap. If that condition obtained, flames would then shoot up from the opening in the top of the tank. It is apparent that an intense fire in the driving compartment would have the same effect on the gasoline tank whether or not it was communicated by way of the carburetor.

That the driving compartment was the first part of the car to catch fire is demonstrated by several circumstances in evidence. Although June testified that if she remembered rightly the wind-shield was open, the positive testimony of the two deputy sheriffs was that it was not open after the fire. If their testimony was true, then the inside of the car could not have caught fire from a flame coming out of the opening provided for filling the tank. The testimony of Lindstrom and the Dion brothers shows that the first appearance of the fire was that of a bonfire or brush fire. Lindstrom testified that the flame later shot up in a

column. Alfred Dion first noticed the flame from the gasoline tank when he reached the premises. A most convincing factor is that decedent's clothing and burns show that an inflammable fluid came from his left. He and the car were afire before June ran for help. It is not even probable that a man would sit in a car, with nothing to prevent his escape, until he caught fire from a blaze originating outside the driving compartment. The opening in the top seam of the tank and the crack in the gauge on the instrument panel may well have been caused by the fire. There is no testimony tending to show that either of them existed previously. It is difficult to conceive that such an intense fire would leave the tank or the gauge intact.

Approximately thirty-five people were at the fire. Some of them were in the driveway, some in the house, and some of them in the yard as far north as the garage. A number of the men were smoking. It is claimed that one of them might have dropped the box of matches found near the driveway. Beyond the bare possibility of such a happening, there is no testimony tending to show that it did happen. The box found there, with the others in the house, accounted for the number of boxes purchased by accused a few days previously. The contention that the fire may have been caused by back-firing when the car stalled against the gate post is untenable. Back-firing causes explosions similar to the discharge of fire-arms. No one testified to hearing any such noise, although June and defendant were on the premises and two other witnesses lived just across the Main street road. In support of the intrinsic defect theory, Harry Carlson, a mechanic and garage owner, and Leonard A. Wheeler, an electrician, testified that faulty wiring connections or worn insulation would probably cause a short circuit and might result in a fire. There is no testimony in the record tending to show a probability that any of the possible defects mentioned by the witnesses were present in decedent's car.

Dr. W. B. McNally is a Chicago physician and toxicologist, with an extensive experience in the examination of stains, drugs, poisons, medicines, food, milk, oils, gasoline, clothing and fabrics. His chemical analysis established that the stains on defendant's dress were the same as stains from crushed berries obtained from the bushes along the driveway of her premises. His testimony showed the condition of the porcelain bowl was caused by the burning of some inflammable substance; that the portions of decedent's clothing left after the fire showed that some highly inflammable substance coming from the left side had been on them; that where wrinkles appeared in the left side of the coat and the left sleeve the coat had absorbed more of the solvent than at other places; that an explosive mixture of gasoline and air could not be ignited by a lighted cigar or pipe but it would have to connect with a flame or an electric spark similar to a flame. On the night of the fire the temperature was sixty degrees. Dr. McNally testified that at such a temperature a mixture of gasoline and air is highly inflammable; that he analyzed the gasoline found in the red can in defendant's garage and found it readily inflammable; that if a lighted match were applied to it, it would be very volatile and would burn out; that if gasoline, such as he described, were thrown from a container and a lighted flame applied to the place of origin the gasoline within the container would catch fire; that if the gasoline struck some object, the air through which it was thrown would become laden with gasoline vapor and the flame would follow as far as twelve feet; that it would cover a sphere a number of feet around the source and spread in a conical area, with a gradual ascent, instantaneously.

Defendant offers no explanation as to how the burned area on the rubber mat on the left running-board could have happened under any of the theories advanced by her. No reasonable hypothesis exists for saying it might have

been fired by gasoline from the tank or carburetor or by back-firing. That it caught fire from spilled gasoline thrown into that side of the car is a logical conclusion from the facts in evidence.

The filling station attendant who sold the gallon of gasoline to defendant testified that its specific gravity was 64. Dr. McNally, who distilled the gasoline found in the red can, testified that its specific gravity at 20° was .689, or what is called 70. It does not appear that the temperature of the gasoline or of the standard used for testing was the same when the specific gravity was determined in each instance. Defendant admitted to Stockburger that it was the same. Stockburger and the coroner testified that on the night of the fire defendant told them she was burned while looking in the car to see if June was there. Sherman Coultas, State fire marshal, testified that he had a conversation with defendant the next day after the fire; that she said she was in the basement, sorting clothes, and heard her daughter come in and go up-stairs; that her daughter came down-stairs; that she (defendant) came up from the basement, looked out of the window and saw the car on fire, and at the same time her daughter cried for help and ran to the filling station; that in explaining her burns, she told him she thought her daughter was in the car and looked into it to see if she was there. If she knew June ran for help she knew she was not in the car. The testimony of Coultas is not disputed.

Just how defendant could have been burned about the head, neck and hands by approaching the car in the manner which she described is not apparent. The wind was in the north or northwest. The closed wind-shield faced north. The car was all afire. The pressure on any gas flame from the tank would send it straight up. For flames from the open windows of the car to reach her as she came from the north they must have traveled against or across the wind, unless she deliberately went into their path, as they blew away from the wind-shield.

Stockburger testified that on the night of the fire he went to the mortuary with defendant, and while they stood at the casket of decedent defendant said, "I don't know why I—I don't know why—I don't know why anyone would want to do a thing of this kind;" that she further said on two occasions while there, "Mr. Stockburger, don't you think whoever did that didn't intend that it should be so serious?" and that on another occasion she told him that at one time, at their other home, she got into an automobile loaned to her by Mr. McColl, stepped on the starter, and that the car burst into flames under the hood; that he asked her if she thought Hanson had done that, and she replied that she had her suspicions. The coroner testified that on the night of the fire she told him several times of that experience and of her suspicions as to who was responsible, and that at the mortuary, in speaking of Hanson's death, she said that perhaps the person who did it did not think it would go that far. That statement does not comport with her contention that the fire was caused by a defect in the car.

One of defendant's contentions on the question of reasonable doubt is that no motive was shown. The prosecution introduced letters and excerpts from a diary alleged to have been written by defendant prior to her divorce, and the testimony of witnesses relating events up to the day before the fire. Without detailing the contents of the letters, it is sufficient to say the references to decedent are scurrilous, profane and abusive in the extreme. One of them to his employer states that if Hanson is ever found on her premises she will "horsewhip the filthy yellow hide clean off of him and cripple the damned rotten tongue of his so that sneaky liar has done its last piece of rotten work." One letter addressed to decedent says, "Should your damn stool pigeons of tenants interfere I'll horsewhip the damn dirty stuffing out of the damn lying thrash, and any interference from you will be treated the same

way." The diary contains several entries derogatory to decedent, unnecessary to repeat here. In 1929 defendant slapped decedent in the face several times at a dance. Before he left home in 1931 Alice Gleasman heard her say over a telephone that she would "get even with him yet and he will never know what happened." A number of apparently credible witnesses testified to vile utterances made by her against decedent, but it is unnecessary to repeat them.

The testimony is sufficient to show, beyond a reasonable doubt, that decedent was burned to death by the agency of gasoline thrown upon his person and set afire, and that the car caught fire in the driving compartment from the blazing gasoline. Defendant's explanation that she purchased gasoline for the purpose of trying to start a car the next day, which she had every reason to know she could not use, is incredible. There is no testimony in the record even tending to show that any other person bore enmity toward decedent or had any motive for harming him. In a criminal case the People are required to establish the guilt of the accused beyond a reasonable doubt. There is a difference between proving guilt beyond a reasonable doubt and proving it beyond the possibility of a doubt. When the evidence is circumstantial the guilt must be so thoroughly established as to exclude every reasonable hypothesis of the defendant's innocence; (*People* v. *Ahrling,* 279 Ill. 70; *People* v. *Bentley,* 357 id. 82;) but the People are not required to establish it beyond the possibility of a doubt. (*People* v. *Lucas,* 244 Ill. 603; *People* v. *Depew,* 237 id. 574; *Pate* v. *People,* 3 Gilm. 644.) A consideration of the whole evidence demonstrates that the jury were warranted in finding defendant guilty beyond a reasonable doubt.

It is claimed that the handwriting of the letters and diary were not properly proven. The standards for comparison consisted of signatures of defendant to pleadings

in the circuit court of Winnebago county. Photographs of the signatures on these documents, with the letters and diary, were admitted in evidence. No objection was raised that the originals of the standards were not admitted. They were attached to the notice to establish standards under the statute and were part of the files in the case. There was no error in admitting the questioned documents or the photographs of the original standards.

It is complained that a plat introduced by the People does not show the roadway gate wholly open. The only objection to the plat when it was offered was that it was not complete. A more elaborate plat introduced by defendant shows in detail the premises and the gate wide open. If there was any error in admitting the plat it was harmless.

There was no error in excluding the testimony of two witnesses that they had seen a tank on a model "A" Ford car explode. It is not claimed that the tank on decedent's car exploded.

Defendant's refused instruction No. 1 stated that if it does not appear that credible evidence could be produced in corroboration of her testimony, the law does not permit the jury to refuse to give it credit merely because it may not be corroborated. The instruction leaves out of consideration the question of whether or not her testimony was improbable or contradictory within itself. Moreover, the question of the weight to be accorded her testimony was fully covered by other instructions.

The court did not err in refusing defendant's instruction that where the guilt of a defendant can be established, if at all, only by proof of a series of facts necessarily dependent upon each other, it is incumbent upon the prosecution to prove, beyond all reasonable doubt, each and every one of such facts. The reasonable doubt which the jury are permitted to entertain must be as to guilt of the accused on the whole evidence and not as to any particular fact in

the case. *People* v. *Bugg*, 345 Ill. 210; *People* v. *True*, 314 id. 89; *People* v. *Judycki*, 302 id. 143.

Defendant's refused instruction No. 12 was covered by her given instruction No. 6.

The sixteenth instruction called attention and gave undue prominence to particular testimony relating to defendant's willingness to answer questions put to her by the officers. There was no error in refusing it.

The third and sixteenth instructions given on behalf of the People are complained of because, it is said, they imply that deceased died of burns. An instruction setting out certain facts which, if proved, would warrant the jury in finding the defendant guilty will not be regarded as assuming such facts because it fails to repeat before each fact stated the words, "If you believe from the evidence, beyond all reasonable doubt." *People* v. *Sapp*, 282 Ill. 51.

There was no error in modifying defendant's given instruction No. 3, which told the jury the People must not only show, by a preponderance of the evidence *and* beyond a reasonable doubt, that the alleged facts and circumstances are true, but they must be such facts and circumstances as are *absolutely* incompatible upon any reasonable hypothesis other than that of the guilt of the accused. The court struck out the two italicized words. In *Everett* v. *People*, 216 Ill. 478, we approved an instruction containing the two stricken words, but there was no question raised such as is raised here. The striking of the two words did not change the meaning of the instruction.

During the course of the trial one juror had some intestinal trouble, which was relieved by a physician in the presence of some of the other jurors. During the last week of the trial one of the jurors received some laundry. A note pinned to it informed him that he had become a grandfather the night before. Another juror whose daughter was to be operated on for appendicitis was allowed to communicate with the doctor about it by telephone, with

the consent of defendant's counsel. The operation was successful and the result was communicated to the juror. The jury retired to consider of their verdict at 12:40 o'clock P. M. December 16. They went to lunch at 1:00 o'clock and returned a verdict at 4:25 P. M. the same day. It is suggested that the communications were improper and that the circumstances might have unduly hastened the verdict. These objections are chimerical.

It is also insisted that because Dr. Palmer did not state positively that Hanson's burns were the cause of his death the *corpus delicti* was not proved. The *corpus delicti* in murder consists of two elements—the fact of death and the criminal agency of another as to the cause of death. Resort may be had to circumstantial evidence to prove the *corpus delicti* in the same way and to the same extent that such evidence may be received to connect the accused person with the commission of the offense. (*People* v. *Gillespie*, 344 Ill. 290; *People* v. *Graves*, 331 id. 268; *People* v. *Sapp, supra.*) It often happens that neither of the two elements can be proved by direct testimony and therefore they may be lawfully proved by circumstantial evidence. Direct testimony is not required to prove the agency causing the death. (*People* v. *Sapp, supra.*) The death of Hanson being established, the criminal agency may be established by circumstantial evidence. (*People* v. *Bentley, supra; People* v. *Schanda,* 352 Ill. 36; *People* v. *Strosnider,* 264 id. 434; *People* v. *Hotz,* 261 id. 239.) The *corpus delicti* was sufficiently proved.

Defendant was accorded a fair trial. The evidence was sufficient to justify the jury in finding her guilty beyond a reasonable doubt, and there is no reversible error in the record. The judgment of the circuit court is therefore affirmed.

*Judgment affirmed.*